UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 11/18/2020

MARCELINO CASTRO,

               Plaintiff,

      v.

CITY OF NEW YORK, CAPTAIN JANET
SMITH, CORRECTIONS OFFICER
OCTAVIAN DUGGINS, CORRECTIONS
OFFICER LEISHA ORTIZ, CORRECTIONS
OFFICER TRISHANN MOWATT,

               Defendant

No. 16-CV-8147 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

     Plaintiff Marcelino Castro, proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983 against the City of New York, Captain Janet Smith, and Correction Officers ("COs") Octavian Duggins, Leisha Ortiz, and Trishann Mowatt, asserting violations of his federal constitutional rights stemming from an incident at Rikers Island on September 10, 2015, in which he alleges to have been harmed and denied medical care. Now before the Court is Defendants' unopposed motion for summary judgment. For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## BACKGROUND[1]

### I.    Events Preceding the September 10, 2015 Incident

Plaintiff was formerly incarcerated at Rikers Island in the Eric M. Taylor Center ("EMTC"). *See* Dkt. 82 ("56.1 Stmt.") ¶ 15.  Plaintiff testified that he had been "sent to [] Bellevue [Hospital]" on an unspecified date, diagnosed with kidney stones, and "prescribed [medication] by the kidney specialist . . . that [his doctors] needed to give [him] twice a day."  Dkt. 83-3, ("Pl.'s Dep.") at 115:25-116:9.  In addition, "[his] prescription needed to be ren[ewed] every week."  *Id.* at 116:12-13. According to Plaintiff's medical records submitted by Defendants, Plaintiff visited the EMTC clinic on September 1, 2015 to seek "renewal of morphine for pain," but was "advised that morphine [would] NOT be renewed, [and] [o]ffered another medication which [Plaintiff] refused."  Dkt. 83-6 at 8-9 (emphasis in original).  Plaintiff then "became verbally loud and angry and had to be escorted from the clinic."  *Id.* at 9.  Plaintiff visited the clinic again on September 8, 2015 and "told the officer he want[ed] to fight" Physician's Assistant ("PA") James Flannery as Plaintiff entered the cubicle. *See id.* at 6.  Plaintiff became "verbally abusive and [was] escorted out of [the] clinic."  *Id.*  Plaintiff signed up for "sick call" on September 10, 2015 so he could "renew [his] medication."  *See* Second Amended Complaint II, Dkt. 33 ("SAC II").

---

[1] The following facts are drawn from Defendants' Rule 56.1 Statement, Dkt. 82 ("56.1 Stmt.") and supporting documents, as well as the Second Amended Complaint, Dkt. 23 ("SAC").  *See Rolkiewicz v. City of New York*, No. 1:16-CV-06771 (ALC), 2020 WL 1033792, at *1 (S.D.N.Y. Mar. 3, 2020) (considering facts from the Amended Complaint on an unopposed motion for summary judgment).  Plaintiff did not file Page 5 of the Court's "Prisoner Second Amended Complaint Form" with the rest of his Second Amended Complaint on May 17, 2017, *see* Dkt. 23, but filed it separately on October 12, 2017, *see* Dkt. 33.  The Court nonetheless construes this page as part of the Second Amended Complaint ("SAC II").  The facts are undisputed unless otherwise noted.  Where disputed, they are construed in the light most favorable to Plaintiff.  *See Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011).

## II.    The September 10, 2015 Incident

### A.  Incident at the Clinic

On September 10, 2015, Plaintiff went to the clinic to "ask for [his] medication."  Pl.'s Dep. at 113:7-8.  After waiting "in line . . . for approximately 40 minutes," Second Amended Complaint, Dkt. 23 ("SAC" or "Complaint") at 7, a male "captain" informed Plaintiff that "the doctor [was] not going to give [the medication] to him," *see* Pl.'s Dep. at 114:5-10.  Plaintiff refused to leave the clinic because "he was in severe pain and did not want to wait any longer for [kidney stone] treatment." SAC at 7.

At approximately 11:15 A.M., Defendant Smith "received a call that [] plaintiff was inside the medical clinic and was acting irate and aggressive."  56.1 Stmt. ¶ 24.  In the clinic, she "spoke with medical staff and learned that [] [P]laintiff had been requesting drugs that the staff was not going to prescribe, and also that [] [P]laintiff had previously threatened a medical staff member inside the clinic."  *Id.* ¶ 26.  For his part, Plaintiff maintains that he "heard a CO misinform the doctor on duty that [he] was seeking pain medication for which he did not have a prescription."  SAC at 7.  Neither party disputes, however, that "Smith spoke with [] [P]laintiff and informed him that he needed to exit the clinic."  56.1 Stmt. ¶ 27; *see also* SAC II.[2]  Plaintiff refused to leave the clinic.  *See* 56.1 Stmt.  ¶ 33; Pl.'s Dep. at 117:16.

According to Defendants, Duggins, Ortiz, and Mowatt heard Plaintiff yelling at Smith about his need for medication and refusal to leave the clinic.  56.1 Stmt. ¶¶ 29-32.  Defendants further allege that Plaintiff threatened to choke Smith.  *Id.* ¶ 34; *see also* Dkt. 83-7 ("Smith Dep.") at 80:9-12 (That's when he became—he still was irate and he said something to the fact, you're lucky I don't choke you or something like that to me.").  After Plaintiff argued with Smith for approximately five minutes and

---

[2] Defendants state that Smith "decided she would bring [Plaintiff] back down to the clinic later on in the day in order to avoid a confrontation between the plaintiff and medical staff," 56.1 Stmt. ¶ 28, but Plaintiff contends that "Captain Smith told [him] . . . to come [back] the next day," SAC II.

Smith again reiterated that Plaintiff needed to leave the clinic, she "grabbed [Plaintiff] by the neck with an injured hand wrapped in a medical brace." 56.1 Stmt. ¶ 35.[3]  Plaintiff contends he responded "quick" by "push[ing] [Smith's] hand out."  Pl.'s Dep. at 121:2-9.  Defendants, by contrast, assert that "[P]laintiff appeared to briefly comply with Captain Smith's orders to leave the clinic," but that "as he walked towards the exit he turned around without warning or provocation and swung his hand at Captain Smith." 56.1 Stmt. ¶ 36.  During the altercation, Smith grabbed her chemical agent and threatened to use it if Plaintiff did not stop. 56.1 Stmt. ¶ 41.  Although she held the chemical agent in her hand, she did not deploy it.  *Id*. ¶ 42.[4]  Defendants contend that Plaintiff "advanced towards Captain Smith, hit her hand and knocked the chemical agent to the floor."  *Id*. ¶ 43.

Plaintiff and Defendants agree that Plaintiff was subsequently hit or punched in the face.  *See id*. ¶¶ 37, 44.  However, the Complaint, Defendants' 56.1 Statement and the exhibits filed in support thereof, and Plaintiff's deposition provide diverging accounts as to the identity of the person who hit or punched him.  In the "Facts" of his Complaint, Plaintiff alleged that the same officer that "grabbed him around the neck"—Smith—also "punched him in the face" and "on his right side near his rib cage."  *See* SAC at 7.[5]  On a separate page of the Complaint that Plaintiff subsequently filed, however, he alleged that Smith "grab[bed] [him] by [the] neck," "another officer push[ed] [him] around and another officer punch[ed] [him] in [his] nose."  SAC II.  In his deposition, Plaintiff again stated that Smith grabbed him, but that she did not punch him:

> "Q: . . . Captain Smith grabbed you by the neck, correct?
> A: Yes.
> Q: Did Captain Smith do anything else?
> A: No. No, she didn't do nothing.

---

[3] Plaintiff maintains that Smith had been injured prior to the incident and "was looking for a victim to justify her injury in her wrist."  Pl.'s Dep. at 131:8-9.; *see also id*. at 120:14-16 ("[S]he got injured right here (indicating) from I don't know . . . and she waited there and then she got the opportunity for her to say, I did it to her.").

[4] Plaintiff testified that he saw Smith holding the spray but that she "didn't use it inside the clinic . . . [b]ecause if she uses it inside the clinic, everybody is going to get that."  Pl.'s Dep. at 132:22-24.

[5] In his deposition, Plaintiff stated that portions of the Second Amended Complaint were written for him, Pl.'s Dep. at 151:18, and that he did not review the document before he signed it, *id.* at 153:2-6.  In particular, he stated that he told the person writing the Second Amended Complaint only "to write broken nose, not the ribs."  *Id.* at 152:14.

. . . .

Q: Captain Smith didn't punch you in the face?

A: She no punch me in the face."

Pl.'s Dep. at 128:25-129:14.  Rather, Plaintiff testified that an African American male officer, whom

he later identified as Officer Duggins, punched him "on the nose."  *See id.* at 121:15-24; 129:15-18;

135:8-9.  Defendants, on the other hand, maintain that after Plaintiff knocked Smith's chemical agent

to the floor, she "swung at [P]laintiff in an effort to create space between her and [P]laintiff and

inadvertently hit him in the face."  56.1 Stmt. ¶¶ 43-44; *see also* Smith Dep. at 122:13-16.  Smith

testified that she "swung because he still was coming towards me aggressively."  Smith Dep. at 123:3-

4.  At his deposition, Duggins did not testify to punching Plaintiff in the face, but rather stated, "[A]ll

I can remember is Castro turned around real quick, almost like a back hand, and I see Captain Smith

go like this out the corner, and I just run and push him on his chest straight to the wall and grabbed

his right arm."  Dkt. 83-8 ("Duggins Dep") at 83:19-24.

## B.  Plaintiff's Removal from the Clinic

Plaintiff was subsequently "removed from the medical clinic by several officers," 56.1 Stmt.

¶ 45, but the parties dispute the circumstances under which Plaintiff's removal occurred.  Plaintiff

alleges that "someone came and cleaned [his] nose and they wanted to push [him] out" of the clinic,

but he "[didn't] want to leave the clinic because he [had] the kidney stone problem and . . . [his] nose

[was] bleeding."  Pl.'s Dep. at 125:13-24.  At some point, Plaintiff asserts, the officers "took [him]

through the hallway punching [him] around."  SAC II.  He testified that "[he] fought back to go back

to the clinic, so [they] started like struggling back and forth and they . . . handcuffed [him] and then

they thr[ew] [him] on the floor."  Pl. Dep. at 137:1-5.  During the incident, he maintains that

"everybody was yelling, like it was the end of the world," and in particular Ortiz was "yelling put

your hands in the back . . . and she was taking the incident like [it] . . . was directly with her."  *Id.* at

135:13-14; 136:9-20.  Plaintiff believes he was "probably" handcuffed by Mowatt.  *See id.* at 135:10-

14.   Plaintiff also testified that "the things that [Defendants] did to [him] with the handcuffs [were] worse than being punched or whatever because they handcuffed [him].... [and] they turned [his] wrists."  *Id.* at 128:2-5.  Plaintiff's deposition testimony is unclear as to whether he believes that he was punched again after he was handcuffed:

> Q: Other than that punch, were you punched at all other than that time by any of the other officers during this incident?
> A: No . . . . The other officers were just yelling at me . . .
> Q: What about kicks, were you kicked by any of the officers or stomped by any of the officers?
> A: When I got handcuffed, I mean they did whatever they wanted. There are some punches that I don't, I'm not aware, I'm not aware that I got them.
> Q: So you believe you were punched by the other officers but you don't know who?
> A: Listen, I don't know what they . . . How do you explain all of the bruises and all of the marks that I have on my body.

Pl's Dep. at 129:24-130:15.  Plaintiff alleges that Smith "was staring at all of the things that were happening" and "was laughing at [him] and . . . saying, [she] [was] going on vacations paid by [him]." *Id.* at 129:10-12.  After being handcuffed, the officers "took [Plaintiff] to the intake," but Plaintiff "[didn't] know how they did that."  *Id.* at 137:5-6.

Defendants, on the other hand, maintain that to remove Plaintiff from the clinic, "Officer Duggins and Officer Ortiz each grabbed one of [] [P]laintiff's arms."  56.1 Stmt. ¶ 46.  For his part, Officer Mowatt testified that, during the altercation Plaintiff and Smith were "inside the clinic and . . . all of a sudden they [were] outside the clinic."  Dkt. 83-10 ("Mowatt Dep.") at 108:19-21.  Ortiz stated at her deposition that the group "f[ell] . . . through the door because the door was open," and ended up "in the corridor," where Plaintiff was "still carrying on, yelling."  Dkt. 83-9 ("Ortiz Dep.") at 98:21-23.  She testified that the officers "guided [Plaintiff] down to the floor" and "wait[ed] for someone to come with the restraints."  *Id.* at 99:12-19.  Duggins similarly testified that he and Ortiz each grabbed one of Plaintiff's arms and "held him there and waited for further assistance."  Duggins Dep. at 83:22-84:3.  When Captain Daniel Lenza, whom Plaintiff did not name as a defendant, entered the scene, he observed Duggins "on the inmate . . . trying to get his hands behind his back," Mowatt

6

"at [Plaintiff's] feet, kind of standing," Ortiz "on the other side of him standing," and Smith "behind, close to the other wall just standing there."   Dkt. 83-17 ("Lenza Dep."), at 95:16-25.   Lenza then "placed [] [P]laintiff in handcuffs as he continued to struggle". 56.1 Stmt. ¶ 52.

### III.   Events Following the Incident

Plaintiff states that he remained "handcuffed in intake . . . in the cell," Pl.'s Dep. at 123:6-9, for "hours" after the incident, during which time Defendants refused to remove the handcuffs so that he could use the restroom, *see* SAC II.

#### A.   The Incident Photos

Captain David Levy took photos of Plaintiff following the incident.   *See* 56.1 Stmt. ¶ 71. Defendants attached the photos from the incident to their motion, *see* Dkt. 83-14, and contend that they "do not depict any injuries on the plaintiff."   56.1 Stmt. ¶ 74.   Plaintiff argues that the investigators taking the photographs "just took pictures that [were] convenient for them."   Pl.'s Dep. at 123:18-19.   He nonetheless asserts that the photographs showed that his "lip [was] swollen," that one side of his nose was "lifted up," that his "neck and the front [were] red" from being grabbed, and that he sustained several bruises.   *Id.* at 146:10-12.[6]

#### B.   Plaintiff's Short-Term Injuries and Medical Records

After "two or three hours," Plaintiff was taken to the "old clinic" for medical evaluation.   *Id.* at 139:7, 18-20.   At approximately 1:23 P.M., PA Sean O'Grady examined Plaintiff and took his vital signs.   *See* 56.1 Stmt. ¶ 63.   O'Grady completed a medical form and wrote that Plaintiff "state[d] he was hit on the nose."   *See* Dkt. 83-6 at 3-4.   He noted "Yes" next to the question, "Did the patient have a blow to the head?" but did not note any abnormalities to Plaintiff's head, eyes, ears, nose, or throat.   *See id.*; 56.1 Stmt. ¶ 67.   Plaintiff contends that the doctor did not examine him, but merely

---

[6] Plaintiff stated that a circular mark on his right side depicted in the photos resulted from him being bitten by a bird in the jail prior to the incident.   *See* Pl.'s Dep. at 147:9-148:10.

said to "bring him to intake."  Pl.'s Dep. at 140:14-19.  Yet Plaintiff and O'Grady both signed the "Injury to Inmate Report" on the date of the incident which noted, "Patient states he was hit on the nose. No injuries observed."  *See* Dkt. 83-12.

According to the Complaint, the incident resulted in a broken nose, bleeding, and "bruising and intense pain" around his ribs.  SAC at 7.[7]  Plaintiff stated he was not in pain "at th[e] moment" he was punched, but "the next day [was] when the pain started."  Pl.'s Dep. at 128:17-18.  Plaintiff also testified that as a result of being handcuffed, his "right and left wrists were injured" and that his shoulder was bruised from when he hit the ground.  *Id.* at 137:15-25.  He also stated that he had bruises on his body "three days after the incident."  *Id.* at 138:2-4.

A medical record from two days after the incident, on September 12, 2015, indicates that Plaintiff visited the clinic and was diagnosed with "renal colic" and "chronic pain syndrome."  Dkt. 83-6 at 1; 56.1 Stmt. ¶ 77.  Defendants contend that Plaintiff "did not seek any treatment for injuries he alleges to have suffered on September 10, 2015."  56.1 Stmt. ¶ 77.

### C.  Captain Smith's Injuries and Plaintiff's Guilty Plea

Following the incident, Smith was examined and found to have "an elevated pulse, elevated blood pressure, tenderness at the base of her thumb and her middle finger and decreased range of motion in her shoulder."  56.1 Stmt.  ¶ 57.  The examiner, PA Glenda Shearn, testified that she "did not note Captain Smith as having had any bandages on her hand at the time she was examined," and "would have noted the presence of bandages on Captain Smith in the event she had seen any at the time of the examination."  *Id.* ¶¶ 58-59.

---

[7] As noted above, at his deposition, Plaintiff denied ever alleging that his ribs were broken during the incident, *see* Pl.'s Dep. at 148:23-149:3, and contends that he only told the person writing the Second Amended Complaint "to write broken nose, not the ribs," *id.* at p.152:14.

On December 26, 2015, Plaintiff was arrested in connection with the incident. *Id*. ¶ 78.  On October 11, 2017, Plaintiff pled guilty to assault in the third degree for assaulting Defendant Smith. *See id.* ¶ 84-85.[8]

### D.  Plaintiff's Alleged Long-Term Injury

Plaintiff alleges that he "[had] to wait two year[s] suffering with [his] nose broken" before finding a doctor to operate.  SAC II.  Plaintiff sought treatment for his nose at Bellevue Hospital on April 14, 2017, and underwent surgery.  *See* SAC at 8.  His medical records attached to the SAC indicate that he was "under [DOC] custody" at the time of the operation.  *See id.* at 9.  The attending surgeon also wrote that Plaintiff "note[d] facial trauma with the nasal bone fracture two years ago, ha[d] had persistent airway deformities and difficulty breathing, [and] ha[d] required [] sinus medications with no relief."  *Id.*  The records also indicate that Plaintiff reported a history of cocaine use, which "put [P]laintiff at risk for 'septal perforation and subsequent deformity' post-surgery." 56.1 Stmt. ¶ 83.  The surgeon performed a septoplasty "via an open approach with placement of spreader grafts."  *See* SAC at 8.  The records indicate that the procedure was performed without complications.  *See id.* at 8-10.

### PROCEDURAL HISTORY

On October 18, 2016, Plaintiff filed his *pro se* Complaint under 42 U.S.C. § 1983, alleging that the New York City Department of Correction and one John Doe officer had violated his constitutional rights.  Dkt. 2.  The Court dismissed Plaintiff's claims against the Department of Correction and substituted it for the City of New York on October 28, 2016.  Dkt. 6.

Plaintiff filed his First Amended Complaint on December 1, 2016, asserting claims against four John Doe Defendants.  Dkt. 13.  The New York City Law Department identified the John Doe

---

[8] Plaintiff stated in his deposition that he "was not telling the truth" during his guilty plea, but only "did that to get out of [prison]."  Pl.'s Dep. at 59:7-8.  He also alleged that Smith was "lying" and "falsified the paper[s]" underlying his conviction.  *Id.* at 59:16-22.

Defendants on December 23, 2016.  Dkt. 14.  On January 24, 2017, the Court issued an order directing Plaintiff to file a second amended complaint naming the John Doe Defendants, and advising him that his "second amended complaint [would] completely replace, not supplement, the original and amended complaints."  Dkt. 16 at 3.

Plaintiff filed his Second Amended Complaint—the operative complaint—on May 17, 2017. Dkt. 23.  As described above, *see supra* note 1, Plaintiff did not file Page 5 of the Court's "Prisoner Second Amended Complaint Form" on May 17, 2017, Dkt. 23, but filed it separately on October 12, 2017, Dkt. 33.  The Court construes this page as part of the Complaint.

On December 3, 2018, pro bono counsel entered a limited appearance, Dkt. 45, and withdrew following the close of discovery on October 2, 2019, Dkt. 80.  Defendants subsequently filed a motion for summary judgment.  Dkt. 81.  Plaintiff informed the Court on March 10, 2020 of his intention not to oppose the motion and asked that the motion be deemed fully briefed, but stated that he nonetheless intended to pursue the case.  Dkt. 91.

On September 28, 2020, the Court issued an Order setting forth the holding of this Opinion, and noting that its ruling would be further clarified in an upcoming telephone conference and opinion. Dkt. 92.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 authorizes a court to grant summary judgment if the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (internal quotation marks omitted).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and it is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation marks omitted).  To survive summary judgment, the moving party has the initial burden of demonstrating that no genuine issue of material

fact exists.  *See Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  If it satisfies this burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id*.

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted).  "Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." *Vermont Teddy Bear Co. v. 1-800 Beargram Co*., 373 F.3d 241, 242 (2d Cir. 2004).  In such cases, the Court must still deny the motion if the movant does not meet his burden of production, or where the undisputed facts fail to "show that the moving party is entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted).

"While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' … and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  "Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor."  *Id*.

Moreover, "[i]t is well established that a court is ordinarily obligated to afford a special solicitude to pro se litigants, . . . particularly where motions for summary judgment are concerned." *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016) (per curiam) (internal quotation marks and citations

omitted).  Thus, "[c]ourts read the pleadings, briefs, and opposition papers of pro se litigants 'liberally and interpret them to raise the strongest arguments that they suggest.'" *Rivera v. Goulart*, No. 15-CV-2197 (VSB), 2018 WL 4609106, at *2 (S.D.N.Y. Sept. 25, 2018) (quoting *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999)).  Accordingly, the Court applies the liberal standard afforded to pro se litigants to Plaintiff's submissions.

## DISCUSSION

Construing the Complaint liberally, Plaintiff appears to allege, pursuant to 42 U.S.C. § 1983, that Defendants infringed his constitutional rights (1) by using excessive force during the incidents on September 10, 2015, and (2) by denying him medical care by failing to examine him adequately after the incident and by refusing to prescribe him medication for kidney stones.  *See* SAC; SAC II.

Defendants argue that they are entitled to summary judgment on both of Plaintiff's claims for four reasons: (1) because Plaintiff is collaterally and judicially estopped from denying he assaulted Defendant Smith; (2) because Plaintiff's version of events is "incredible" and should be disregarded; (3) because Plaintiff's excessive force and deliberate indifference to medical needs claims fail as a matter of law; and (4) because Defendants are entitled to qualified immunity.  For the reasons that follow, the Court finds that Plaintiff has raised material issues of fact with respect to the alleged punch that occurred in the clinic, but has failed to establish any other triable claims of excessive force based on the other events of September 10, 2015.  The Court also holds that Plaintiff has failed to establish a triable claim for denial of medical care.

### I.    Effect of Plaintiff's Guilty Plea

Defendants first argue that Plaintiff is collaterally and judicially estopped from denying that he intended to cause and actually caused physical injury to Defendant Smith as a result of his guilty plea to third-degree assault in connection with the September 10 incident.  The Court agrees that

Plaintiff is collaterally estopped from making any such denial, but finds that this does not serve as a bar to Plaintiff's § 1983 claims.

"Collateral estoppel, or issue preclusion, prevents parties or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288 (2d Cir. 2002). "Collateral estoppel saves parties and the courts from the waste and burden of relitigating stale issues, and, by discouraging inconsistent results, forwards public policy favoring the establishment of certainty in legal relations." *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 719 (2d Cir. 1993) (citation omitted); *see also Envtl. Def. v. EPA*, 369 F.3d 193, 202 (2d Cir. 2004) ("The doctrine serves to 'relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication.'" (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980))). Issue preclusion "bars litigation of an issue when (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Proctor v. LeClaire*, 715 F.3d 402, 414 (2d Cir. 2013) (internal quotation marks omitted). To determine whether a state court judgment is subject to collateral estoppel, a federal court must give "the same preclusive effect as would be given to the judgment under the law of the State in which the judgment was rendered." *Johnson v. Watkins*, 101 F.3d 792, 794 (2d Cir. 1996). "Under New York law, because a criminal conviction is considered a valid final judgment for purposes of issue preclusion, it bars relitigation of all of the factual issues upon which that conviction was based." *Colliton v. Donnelly*, 399 F. App'x 619, 620 (2d Cir. 2010). A § 1983 plaintiff who entered a guilty plea in state court and "who neither appealed his state court conviction nor sought to withdraw his plea, is collaterally estopped from challenging the facts supporting his conviction." *Id*. at 620-21.

Plaintiff's plea of guilty to assaulting Smith satisfies the four criteria for issue preclusion.  The issue of whether Plaintiff assaulted Smith was necessarily raised in his plea allocution on October 11, 2017, when Plaintiff made the following admission:

> The Court: Assault in the third degree, class A misdemeanor, count three: It's alleged that you committed this crime on or about September 10, 2015, in the county of Bronx, with intent to cause physical injury to Captain Janet Smith, you did cause such injury to that person. Do you acknowledge that you're guilty of this offense?
> The Defendant: Yes.

Dkt. 83-20 at 7-8.  Further, Plaintiff was advised of his right to a trial by jury and his rights at trial, *id.* at 4-6, and chose to waive those rights, *id.* at 6.  Neither the Complaint, Plaintiff's deposition testimony, nor any other evidence in the record suggests that Plaintiff was deprived of the opportunity to litigate the third-degree assault charge.  Finally, the issues of whether Plaintiff intended to assault Captain Smith and to cause injury were elements of the assault charge, and were thus "necessary to support a valid and final judgment on the merits."  *Proctor*, 715 F.3d at 414.  Under the collateral estoppel doctrine, then, Plaintiff, who, based on the record, "neither appealed his state court conviction nor sought to withdraw his plea, is collaterally estopped from challenging the facts supporting his conviction."  *Colliton*, 399 F. App'x at 620-21.  Specifically, Plaintiff is precluded from relitigating whether on September 10, 2015, "with intent to cause physical injury to Captain Janet Smith, [he] did cause such injury to that person."  Dkt. 83-20 at 7.[9]

The Second Circuit has stated, however, that "the jury's return of a guilty verdict in state court for resisting arrest and/or other offenses such as assault on a police officer does not necessarily preclude a subsequent claim of excessive force in federal court."  *Sullivan v. Gagnier*, 225 F.3d 161,

---

[9] Because Plaintiff is collaterally estopped from raising facts inconsistent with his guilty plea, the Court need not also consider Defendants' arguments regarding judicial estoppel.  *See Routier v. O'Hara*, No. 08-CV-02666 CBA LB, 2013 WL 3777100, at *8 n.1 (E.D.N.Y. July 17, 2013) (finding it "unnecessary" to reach the issue of judicial estoppel when collateral estoppel barred plaintiff from re-litigating the facts supporting his guilty plea).

165 (2d Cir. 2000).  Similarly, Plaintiff's guilty plea to assaulting Smith does not necessarily preclude his claim of excessive force here, nor does it preclude his claim for denial of medical care.

## II.  § 1983 Claims

The Court next considers Plaintiff's § 1983 claims against both the City of New York and each of the individual defendants.

### A.  Legal Standard

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C. § 1983.  To state a claim under § 1983, a plaintiff "must allege (1) that the conduct complained of was committed by a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Dwyer v. Regan*, 777 F.2d 825, 828 (2d Cir. 1985), *modified*, 793 F.2d 457 (2d Cir. 1986).  Because Plaintiff asserts claims against several individuals and seeks monetary damages, he must also demonstrate that each officer was "personally involved" in depriving him of his constitutional rights. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

As an initial matter, summary judgment is appropriate for Plaintiff's claims against the City of New York because Plaintiff has failed to establish facts supporting municipal liability.  It is well-established that municipalities cannot be liable merely because they employ a tortfeasor. *See Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997).  Instead, a government body is liable for a violation of Section 1983 only "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S.

51, 60 (2011) (quoting *Monell v. N.Y.C. Dept. of Social Servs.*, 436 U.S. 658, 692 (1978)).  A claim for municipal liability under Section 1983 thus requires a plaintiff to "plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (internal quotation marks omitted).  "[I]solated acts of excessive force by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability."  *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012).  Plaintiff has not alleged any facts in his Complaint from which a reasonable jury could conclude that the incident on September 10, 2015 was anything more than an "isolated act[]," nor does he point to any "custom[s], polic[ies], or usage[s]" supporting such an inference.  *Id.*  Because Plaintiff has not alleged, nor set forth any evidence supporting, a claim for municipal liability, his Section 1983 claims against the City must be dismissed.

With respect to Plaintiff's claims against the individual defendants, neither party disputes that the four officers, as employees of the New York City Department of Correction ("DOC"), were acting under color of state law at the time of the incident.  If the Court finds that Plaintiff has established one or more triable § 1983 claims, Defendants contend that they are nonetheless entitled to qualified immunity "because it was objectively reasonable for them to think their conduct did not violate sufficiently clear law."  Dkt. 84, ("Mot.") at 20.  "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Tracy v. Freshwater*, 623 F.3d 90, 95–96 (2d Cir. 2010) (quoting *Kelsey v. County of Schoharie*, 567 F.3d 54, 60–61 (2d Cir. 2009)); *see also Rogoz v. City of Hartford*, 796 F.3d 236, 247 (2d Cir. 2015).  "The issues on qualified immunity are: (1) whether plaintiff has shown facts making out [a] violation of a constitutional right; (2) if so, whether

that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the officer to believe the conduct at issue was lawful." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (internal quotation marks omitted).   Under qualified-immunity analysis, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 570 U.S. 650, 656 (2014) (per curiam).

### B. Discussion

The Court will consider Plaintiff's claims of excessive force based on his allegations (1) that Smith "grabbed his neck" in the clinic; (2) that Smith or Duggins "punched" him; (3) that Ortiz "yelled at" him; (3) that Mowatt handcuffed him; and (4) that the officers injured him after he was handcuffed.   The Court also considers Plaintiff's claims for denial of medical care relating to (1) the denial of medication for kidney stones and (2) the failure to adequately examine him after the incident. With respect to each of these claims, the Court asks whether Plaintiff has sufficiently established a constitutional violation and, if so, whether Defendants would be entitled to qualified immunity.   *See Gonzalez*, 728 F.3d at 154.   For the reasons that follow, the Court finds that Plaintiff has failed to establish triable claims for excessive force, with the exception of his claims regarding the punch in the clinic.   With respect to those claims, Defendants are not entitled to qualified immunity at this stage.   The Court further holds that Plaintiff has failed to establish triable claims for denial of medical care.

### 1. Excessive Force Claims

The assault of prisoners is proscribed by the Eighth Amendment.   *Crawford v. Cuomo*, 796 F.3d 252, 257 (2d Cir. 2015).   To sustain an Eighth Amendment claim for excessive force, a plaintiff must establish both a subjective and objective component.   *See, e.g., id.* at 256.

"The subjective component of the claim requires a showing that the defendant 'had the necessary level of culpability, shown by actions characterized by "wantonness"' in light of the

particular circumstances surrounding the challenged conduct." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (quoting *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). "[T]he test for wantonness 'is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Harris*, 818 F.3d at 63 (quoting *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003)). "To determine whether defendants acted maliciously or wantonly, a court must examine several factors including: the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott*, 344 F.3d at 291 (internal quotation marks omitted). "Accordingly, determining whether officers used *excessive* force necessarily turns on the need for the force used." *Harris*, 818 F.3d at 64 (emphasis in original).

Second, for the objective component, "[the inmate] must allege that the conduct was objectively harmful enough or sufficiently serious to reach constitutional dimensions." *Id.* (internal quotation marks omitted). This inquiry is context specific and "depends upon the claim at issue" because "the Eighth Amendment's prohibition of cruel and unusual punishments draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (internal quotation marks omitted). The Second Circuit has nonetheless described "the malicious use of force to cause harm" as constituting a "*per se*" violation of the Eighth Amendment, "because when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated." *Harris*, 818 F.3d at 64 (internal quotation marks omitted). Thus, the objective component "is satisfied in the excessive force context even if the victim does not suffer serious, or significant injury, as long as the amount of force used is not *de minimis*." *Id.* (internal quotation marks omitted).

18

Finally, "whether a 'use of force was' justified is a 'fact intensive inquiry' that often must be 'left for a jury to decide.'" *Ismael v. Charles*, No. 1:18-CV-3597-GHW, 2020 WL 4003291, at *7 (S.D.N.Y. July 15, 2020) (internal quotation marks omitted). For this reason, judges in this district have recognized that "'granting summary judgment against plaintiffs on excessive force claims is rarely appropriate.'" *Id.* (quoting *Anderson v. City of New York*, No. 1:16-cv-02583 (ALC), 2019 WL 1426723, at *8 (S.D.N.Y. Mar. 28, 2019)). The Second Circuit has thus "reversed summary dismissals of Eighth Amendment claims of excessive force even where the plaintiff's evidence of injury was slight and the proof of excessive force was weak." *Wright*, 554 F.3d at 269 (collecting cases).

### a.   "Grab" by Captain Smith in the Clinic

Plaintiff alleges that Smith used excessive force when she "grab[bed] [him] by the neck" while wearing a medical brace on her hand after he refused to leave the medical clinic. SAC II; 56.1 Stmt. ¶ 35. Immediately preceding this use of force, Plaintiff asserts that Smith informed him that he would need to leave the clinic, but he refused repeatedly in an interaction that lasted "five minutes." *See* Pl.'s Dep. at 117:16-23, 119:13-24. During this time, Plaintiff was in "severe pain" from his kidney stones. SAC at 7. Plaintiff also maintains that Smith sought out the incident to have "the opportunity. . . to say[] he" injured her hand. *See* Pl.'s Dep. at 120:14-17. After the incident, he asserts, Smith "was laughing at [him] and . . . saying, [she] [was] going on vacations paid by [him]." *Id.* at 129:10-12. He also noted "red[ness]" around his neck from the grab. *See id.* at 146:23. Ultimately, the Court finds that Defendants are entitled to summary judgment because there is no genuine issue of material fact as to whether Smith's action satisfied the subjective or objective requirements for a § 1983 claim.

With respect to the subjective component, Plaintiff fails to introduce sufficient evidence to suggest that Smith acted "maliciously and sadistically to cause harm" rather than "in a good-faith effort to maintain or restore discipline." *Harris*, 818 F.3d at 63. Plaintiff admits that Smith grabbed

him after an initial verbal altercation where he refused to leave the clinic. *See* SAC at 7. Any reasonable juror would thus find that Smith felt there was a "need for the application of force" after Plaintiff repeatedly refused to comply with Smith's orders, and that Smith attempted to "temper the severity of a forceful response" when she spoke with him for five minutes before using force. *Scott*, 344 F.3d at 291; *see also Beauvoir v. Falco*, 345 F. Supp. 3d 350, 371 (S.D.N.Y. 2018) (finding that officers attempted to temper the severity of a forceful response when video surveillance indicated they spoke with Plaintiff before using force); *Perry v. Stephens*, 659 F. Supp. 2d 577, 583 (S.D.N.Y. 2009) (granting summary judgment on excessive force claim where "Plaintiff offer[ed] no evidence that Defendant sought to wantonly inflict pain in response to Plaintiff's refusal to obey a direct order"). Furthermore, Plaintiff's medical records indicate that he had been escorted out of the clinic on two prior occasions for being "very angry and verbally threatening" and "verbally loud and angry," *see* Dkt. 83-6 at 6, 9, and Defendants maintain that Smith "learned that . . . plaintiff had previously threatened a medical staff member" when she entered the clinic, 56.1 Stmt. ¶ 27. These facts may have heightened the "threat reasonably perceived by" Smith. *Scott*, 344 F.3d at 291.

Although Plaintiff alleges in conclusory fashion that Smith was seeking "the opportunity to say[]" he caused her preexisting hand injury, *see* Pl.'s Dep. at 120:14-17, no reasonable juror could credit the contention that an officer would wear a medical brace *before* an altercation to later assert that the altercation itself caused the injury. Finally, Plaintiff's testimony that Smith "laugh[ed] at him" after the incident and said she was "going on vacations paid by [him]," though disturbing if true, is insufficient to raise a triable issue of fact as to Smith's mental state before and during the altercation.

Even if Plaintiff had established the subjective component of his claim with respect to the neck grab, he has nonetheless failed to establish the objective component. Plaintiff's evidence does not indicate that Smith's neck grab was "sufficiently serious to reach constitutional dimensions." *Harris*, 818 F.3d at 64 (internal quotation marks omitted). Although Plaintiff's "skin [was] red"

20

following the incident, *see* Pl.'s Dep. at 146:22-23, Plaintiff does not allege that he suffered from this neck injury for a significant period of time.  Indeed, some courts in this district have found that corrections officers did not engage in excessive force when they grabbed prisoners by the neck.  *See, e.g., Wright*, 554 F.3d at 262, 269 (prisoner's allegation that prison officer "plac[ed] one hand on the back of [Plaintiff's] neck [and] grabbed [his] abdomen at the site of [his] colon surgery" did not satisfy objective component); *see also Perry*, 659 F. Supp. 2d  at 582 (evidence that Plaintiff suffered "'a little bruise,' and minor pain that abated after 'about four days'" was *de minimis*).

Plaintiff has thus failed to raise a material issue of fact as to the objective or subjective components of his Eighth Amendment excessive force claim relating to Smith's grabbing of his neck.

### b.  Punch by Officer Duggins or Captain Smith in the Clinic

Plaintiff next alleges that an officer used excessive force by "punch[ing] him in the face[,] breaking his nose and causing it to bleed."  SAC at 7.  Although a jury may well find that, if Plaintiff was in fact punched, the punch was either accidental or justified, the Court cannot decide that issue as a matter of law.   Defendants Duggins and Smith—the only defendants who could be held liable for this claim—are thus denied summary judgment with respect to the alleged punch.

As described above, in his Complaint, Plaintiff appeared to allege that a single officer "grabbed him around the neck *and* punched him in the face."  *See* SAC at 7 (emphasis added). Because neither party appears to dispute that Smith was the officer who grabbed Plaintiff by the neck, *see* 56.1 Stmt. ¶ 35, Plaintiff thus seemed to maintain that Smith also "punched him" after grabbing his neck.  However, on a separate page of the Complaint that Plaintiff later filed, *see supra* note 1, he claimed that Officer Smith "grab[bed] [him] by the neck," "another officer push[ed] [him] around[,] and another officer punch[ed] [him] in [his] nose."  SAC II.  The Complaint is thus internally inconsistent as to whether one officer grabbed and punched Plaintiff, or whether one officer grabbed him and a second officer punched him.  At Plaintiff's deposition, he asserted that after Smith grabbed

him, he "grabbed [Smith's] hand" and "pushed her hand out," Pl.'s Dep. at 121:2-9, and then another

officer "saw that [and] came and []punched [him]," *id.* at 121:15-17.  When Plaintiff was specifically

questioned as to the identity of the person who punched him, he denied that Smith had punched him,

and rather identified Duggins:

> Q: . . . Captain Smith grabbed you by the neck, correct?
> A: Yes.
> Q: Did Captain Smith do anything else?
> A: No. No, she didn't do nothing.
> . . . .
> Q: Captain Smith didn't punch you in the face?
> A: She no punch me in the face.

*Id.* at 128:25-129:14.  Instead, Plaintiff asserted that it was an African American male officer who

punched him, *id.* at 121:15-24; 129:15-18, whom he later identified as Officer Duggins:

> Q: What did Officer Duggins do to you?
> A: He is the one that broke my nose.

*Id.* at 135:8-9.

Defendants' account of the punch aligns more closely with Plaintiff's initial account, as they

maintain that after Plaintiff knocked Smith's chemical agent to the floor, she "swung at [P]laintiff in

an effort to create space between her and [P]laintiff and inadvertently hit him in the face."  56.1 Stmt.

¶¶ 43-44; *see also* Smith Dep. at 122:13-16.  Smith testified that she "swung because he still was

coming towards me aggressively."  Smith Dep. at 123:3-4.  At his deposition, Duggins did not testify

to punching Plaintiff in the face, but rather stated, "[A]ll I can remember is Castro turned around real

quick, almost like a back hand, and I see Captain Smith go like this out the corner, and I just run and

push him on his chest straight to the wall and grabbed his right arm."  Duggins Dep. at 83:19-25.

The diverging accounts thus create issues of fact as to 1) the identity of the Defendant who hit

Plaintiff, and 2) whether Plaintiff was in fact "punched," Pl.'s Dep. at 121:15-17, or "inadvertently

hit . . . . in an effort to create space," 56.1 Stmt. ¶¶ 43-44; *see also* Smith Dep. at 122:13-16.  The

parties also appear to dispute whether the punch occurred after Plaintiff "knocked [Smith's] chemical

22

agent to the floor," 56.1 Stmt. ¶ 43, or after Plaintiff "grabbed [Smith's] hand" and "pushed her hand

out," Pl.'s Dep. at 121:2-9.   These factual disputes are material to both the objective and subjective

components of Plaintiff's claim of excessive force.

As to the subjective component, there is a triable issue of fact as to whether the officer who

hit or punched Plaintiff acted with "the necessary level of culpability." *Harris*, 818 F.3d at 63.

Reasonable jurors could disagree, for instance, over whether the officer who hit Plaintiff was acting

to "maintain or restore discipline," *id.* at 63, after Plaintiff refused to exit the clinic despite Smith's

attempts to verbally reason with him. S*ee Kee v. Hasty*, No. 01 CIV.2123(KMW)(DF), 2004 WL

807071, at *12 (S.D.N.Y. Apr. 14, 2004) ("Where a prison disturbance was in progress at the time of

the alleged constitutional violation, wide-ranging deference must be accorded to the actions of the

prison officials in quelling the disturbance.") (internal quotation marks omitted).   Based on Plaintiff's

deposition testimony that Duggins intervened "when he saw" Plaintiff grab Smith's hand, Pl.'s Dep.

at 121:15-17, reasonable jurors could also dispute whether Plaintiff's act of grabbing Smith's hand

established a "need for the application of force," *Scott*, 344 F.3d at 291; *see also Kalwasinski v. Artuz*,

No. 02 CV 2582 (LBS), 2003 WL 22973420, at *4 (S.D.N.Y. Dec. 18, 2003) (holding use of force

by prison guard justified when a prisoner refused to obey his orders because "open melee between a

guard and a prisoner represents a serious threat to prison order and discipline").

Reasonable jurors could also disagree on the extent of Plaintiff's injury, the factual issue that

determines the objective element of his excessive force claim.   On the one hand, Plaintiff alleges that

the Defendant who punched him broke his nose and that he "[had] to wait two year[s] suffering with

[his] nose broken" before he received an operation.   SAC II.   A reasonable juror could thus conclude

that Plaintiff has established more than a *de minimis* injury, which weighs on the analysis as to both

the objective component and Defendants' subjective state of mind.   *See McMillian*, 503 U.S. at 7

("[T]he extent of injury suffered by an inmate is one factor that may suggest whether the use of force

could plausibly have been thought necessary in a particular situation." (internal quotation marks omitted)).   On the other hand, Defendants have provided contemporaneous photos and medical records, which suggest that Plaintiff suffered only bruises and scratches from the incident.  *See* 56.1 Stmt. ¶¶ 67, 71.[10]

In sum, the Court finds that there are genuine issues of material fact as to whether either Smith or Duggins was acting "maliciously and sadistically to cause harm" and whether the resulting injuries, if any, were "sufficiently serious."  *Harris*, 818 F.3d at 64.  For similar reasons, the Court holds that Defendants Smith and Duggins are not entitled to qualified immunity on Plaintiff's claim with respect to the punch.  There is a genuine dispute as to whether Plaintiff has established facts making out a violation of his constitutional right.   Accepting Plaintiff's version of events—that one of the Defendants deliberately punched him with the intent to cause harm—would likely preclude a finding that Plaintiff's rights were not clearly established at the time of the violation, or that it was objectively reasonable for Duggins or Smith to believe the conduct at issue was lawful.  The Court thus denies summary judgment on this claim.

### c.  Ortiz's Yelling During the Incident

Plaintiff fails to establish that Ortiz's conduct during the incident amounted to a constitutional violation.  The Court thus grants summary judgment to Ortiz.

In his deposition, Plaintiff testified that Ortiz came into the clinic "after she started listening to the argument[]" he had with Smith.  *See* Pl.'s Dep. at 119:10-12.  According to his testimony, Ortiz was primarily involved in the incident by "screaming":

Q. Earlier you referred to Officer Ortiz who was, I believe, she was in the dentist clinic at the beginning of this incident; is that right?

---

[10] Although Defendants maintain that the incident photos "do not depict any injuries on the plaintiff," 56.1 Stmt. ¶ 74, and that Plaintiff's medical records after the incident do not support his contentions, 56.1 Stmt. ¶¶ 64-67, it is well established in this Circuit that at the summary judgment stage, the Court "may not make credibility determinations or weigh the evidence" because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Rogoz*, 796 F.3d at 245 (internal quotation marks omitted).

A: Yes.

Q: What did Officer Ortiz do to you during this incident?

A. I heard her screaming, oh, put your hands in the back, put your hands in the back, like crazy, like the whole world finished . . . Officer Ortiz was yelling put your hands in the back, put your hands in the back, and screaming like if it was the end of the world.

Q. Did Officer Ortiz do or say anything else? . . .

A: She was taking, she was taking, I only heard the voice screaming and she was taking the incident like if she was the incident, was directly with her.

Pl's Dep. at 136:4-20.  For their part, Defendants maintain that Ortiz grabbed one of Plaintiff's arms during the altercation.  *See* 56.1 Stmt. ¶ 46.  Ortiz testified that she "grab[bed] [Plaintiff's] arm to cease his aggression," and ultimately "[held] him on his left side, restraining him, waiting for someone to come with the restraints."  Ortiz Dep. at 98:19-20, 99:12-19.  Based on this evidence, Plaintiff has failed to raise a material issue as to whether Ortiz's conduct satisfied the objective component of an Eighth Amendment excessive force claim.

Plaintiff does not appear to allege that Ortiz used any physical force against him during the incident.  Her screaming alone cannot form the basis of his excessive force claim, as "[i]t is well-settled that verbal harassment by a corrections officer, inexcusable though it be, does not rise to the level of a constitutional violation." *Jones v. Harris*, 665 F. Supp. 2d 384, 396 (S.D.N.Y. 2009) (citing *Purcell v Coughlin*, 750 F.2d 263, 265 (2d Cir. 1986).  Nor does Plaintiff attribute any of his physical injuries from the incident to any actions taken by Ortiz.  *See* Pl.'s Dep. at 136:4-20.  Indeed, he does not allege that he suffered any injuries to his arm, the only part of Plaintiff's body that Ortiz testified to have touched.  As Plaintiff has not established a material issue of fact as to the objective component of his Eighth Amendment excessive force claim against Ortiz, summary judgment is granted.

### d.  Mowatt's Handcuffing Outside the Clinic

Plaintiff similarly fails to establish an issue of material fact as to whether Mowatt used excessive force against him.

In his deposition, Plaintiff contended that Officer Mowatt "probably" handcuffed him:

Q: What did Officer Mowatt do to you during this incident?

A: Probably she handcuffed me but I'm not sure. I mean, everybody was yelling, like it was the end of the world.

Pl's Dep. at p.135:10-14.  Plaintiff also asserted that "the things that [Defendants] did to [him] with the handcuffs [were] worse than being punched or whatever because they handcuffed [him] …. [and] they turned [his] wrists." *Id.* at 128:2-5.  He also stated that his "right and left wrists were injured" after the handcuffing and that his shoulder was bruised from when he hit the ground.  *Id.* at 137:15-25.  By contrast, Defendants claim that Captain Lenza, not Officer Mowatt, placed Plaintiff in handcuffs. 56.1 Stmt. ¶ 52.[11]  Defendants' evidence suggests that Mowatt played a minor role in the incident.  Smith acknowledged only that Mowatt was present in the clinic.  *See* Smith Dep. at 82:19-22.  Duggins stated that he "[didn't] remember Mowatt until [they] [were] on the floor with [Plaintiff]."  Duggins Dep. at 84:23-25.  Lenza testified that Mowatt was "standing at [Plaintiff's] feet" when he became involved in the incident.  Lenza Dep. at 95:16-19.  Defendants thus dispute whether Mowatt used any force at all against Plaintiff during the incident.

Nonetheless, even viewing the evidence in the light most favorable to Plaintiff, he has failed to establish a constitutional claim against Mowatt based on the alleged handcuffing.  Plaintiff recounted that he experienced pain during the handcuffing when Defendants "turned [his] wrists," Pl.'s Dep. at 128:2-5, but does not allege that he suffered any lasting injuries based on this incident. Instead, he testified, without more, that "[his] right and left wrists were injured" afterwards and that his shoulder was bruised from when he hit the ground.  *Id.* at 137:15-25.  Although "improper use of handcuffs may constitute excessive force . . . the failure to allege any continuing injury from the handcuffing is fatal to a claim of excessive force under the Eighth Amendment."  *Ellis*, 2020 WL 1956963, at *13 (internal quotation marks omitted).  Plaintiff has failed to present sufficient evidence to create a material issue of fact as to whether the act of handcuffing him was done in a manner so

---

[11] As stated above, Plaintiff does not bring any claims against Captain Lenza.  *See* SAC.

improperly as to constitute excessive force. *See Bridgeforth v. Cty. of Rensselaer*, No. 1:08-CV-0779 LEK/RFT, 2012 WL 2873361, at *6 (N.D.N.Y. July 12, 2012) (granting summary judgment where "Plaintiff provide[d] practically no description of the specific conduct ascribed to [Defendant] in his [] Complaint but claim[ed] in his deposition that [Defendant] violently handcuffed him.").  The lack of evidence about Mowatt likewise provides no basis upon which any jury could find that Mowatt acted with "wantonness" at any point during the incident. *Harris,* 818 F.3d at 63.  Based on the undisputed facts, then, the Court cannot conclude that the handcuffing, which followed a struggle between Plaintiff and officers during which Plaintiff repeatedly resisted their orders, rises to the level of a constitutional violation.  The Court thus grants summary judgment with respect to Plaintiff's claim against Mowatt regarding the handcuffing.

### e.  The Officers' Conduct After the Handcuffing

Lastly, the Complaint could be understood to allege that Plaintiff suffered additional injuries as a result of events that transpired after he was handcuffed.  The Court finds that Plaintiff has also failed to establish a triable claim based on these events.

Plaintiff fails to provide a consistent account of the events that followed the punch in the clinic and the handcuffing.  In his Complaint, Plaintiff alleged that "the same CO [that broke his nose] punched [him] on his right side near his rib cage."  SAC at 7.  In addition, Plaintiff asserted that the officers "took [him] through the hallway punching [him] around."  SAC II.  At his deposition, Plaintiff testified that "[he] fought back to go back to the clinic, so [they] started like struggling back and forth and they . . . handcuffed [him] and then they thr[ew] [him] on the floor," which caused bruising to his shoulder. *Id.* at 136:24-137:25. As to the events following his handcuffing, Plaintiff provided the following testimony:

> Q: Other than that punch, were you punched at all other than that time by any of the other officers during this incident?
> A: No . . . . The other officers were just yelling at me . . .
> Q: What about kicks, were you kicked by any of the officers or stomped by any of the

27

officers?
A: When I got handcuffed, I mean they did whatever they wanted. There are some punches that I don't, I'm not aware, I'm not aware that I got them.
Q: So you believe you were punched by the other officers but you don't know who?
A: Listen, I don't know what they . . . How do you explain all of the bruises and all of the marks that I have on my body.

Pl's Dep. at 129:24-130:15.  After being handcuffed, Plaintiff contends the officers "took [him] to the intake," but he "[didn't] know how they did that."  *Id.* at 137:5-6.  As noted above, the Complaint alleged that he suffered from "bruising and intense pain" around his ribs after the incident, SAC at 7, but Plaintiff denied at his deposition that he intended to make this allegation, testifying instead that he told his legal representative to "write broken nose, not the ribs" *see* Pl.'s Dep. 152:14.  Plaintiff also attributed a circular mark on his abdomen depicted in the incident photos to a bird or animal bite, rather than a bruise.  *See id* at 147:9-148:10.  Plaintiff nonetheless maintained that he had a swollen lip immediately after the incident and bruises on his body "three days after the incident."  *See id*. at 138:2-4, 146:10.

Defendants, by contrast, maintain that "Officer Duggins and Officer Ortiz each grabbed one of [P]laintiff's arms" to remove Plaintiff from the clinic, and then Captain Lenza, rather than any of the Defendants, handcuffed Plaintiff.  56.1 Stmt. ¶ 46, 52.  Officer Mowatt testified that during the altercation, Plaintiff and Smith were "inside the clinic and . . . all of a sudden they [were] outside the clinic."  Mowatt Dep. at 108:18-21.  Ortiz stated at her deposition that the group "f[ell] . . . through the door [of the clinic] because the door was open," and ended up "in the corridor," and then the officers "guided [Plaintiff] down to the floor " and "wait[ed] for someone to come with the restraints."  Ortiz Dep at 98:21-23, 99:12-19.  Duggins similarly testified that he and Ortiz each grabbed one of Plaintiff's arms and "held him there and waited for further assistance."  Duggins Dep. at 83:22-84:3.  When Captain Daniel Lenza entered the scene, he observed Duggins "on the inmate . . . trying to get his hands behind his back," Mowatt "at [Plaintiff's] feet, kind of standing," Ortiz "on the other side

of him standing" and Smith "behind, close to the other wall just standing there."  Lenza Dep. at 95:16-25.  Lenza then "placed the plaintiff in handcuffs as he continued to struggle." 56.1 Stmt. ¶ 52.

Although the parties dispute exactly what happened after Plaintiff was escorted out of the clinic, the Court finds that no reasonable juror could conclude that Plaintiff has established an excessive force claim based on the events occurring after the handcuffing, even viewing the evidence in the light most favorable to Plaintiff.  Indeed, there is no evidence in the record that any of the four individual defendants caused him objective harm following the handcuffing.  At his deposition, Plaintiff provided testimony as to his beliefs about each individual defendant's use of force against him on September 10, 2015.  As described above, Plaintiff testified that any force effected by Smith or Duggins occurred while Plaintiff was still in the clinic, before he was handcuffed.  *See* Pl.'s Dep. at 128:25-129:14 (Smith); *id.* at 135:8-9 (Duggins).  Plaintiff did not testify that Officer Ortiz caused him any objective physical harm.  *See id*. at 136:4-20.  As to Officer Mowatt, Plaintiff testified only that "she handcuffed me but I'm not sure." *Id*. at 135:12.

Plaintiff thus does not introduce any evidence, including through his own testimony, that any of the individual officers caused him physical harm following the handcuffing.  When viewed in the context of the above-cited testimony, Plaintiff's vague allegation that "all of [the Defendants] were involved," *see id.* 135:17-18, fails to create a genuine dispute as to whether Defendants used excessive force against Plaintiff .  *See Prescott v. Riker Island Med. Staff*, No. 09 CIV. 255 SAS, 2011 WL 1435218, at *7 (S.D.N.Y. Apr. 12, 2011) (granting summary judgment "[b]ecause [Plaintiff] fail[ed] to offer any evidence that [three individual defendants] had any involvement in the alleged use of excessive force [and] his claim [was thus] conclusory").[12]

---

[12] Prison officials can be held liable under 42 U.S.C. § 1983 for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence. *See Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001).  However, Plaintiff has not alleged any facts from which a jury could conclude that *another* official caused him physical harm after he was handcuffed and that the individual defendants failed to intervene.

Moreover, Plaintiff's alleged injuries arising from all of the events of September 10, 2015 include: (1) a broken nose and bleeding, which he attributed to the punch in the clinic, *see* SAC II; (2) "bruising and intense pain" around his ribs, *see* SAC at 7, which Plaintiff later denied alleging and attributed to a bird or animal bite, *see* Pl.'s Dep. at 152:14, 147:9-148:10; (3) unspecified "injur[ies]" to his wrists, which Plaintiff attributed to the handcuffing itself, *see id.* at 137:15-16; (4) bruising to his shoulder, which Plaintiff likewise attributed to being thrown to the ground when he was handcuffed, *id.* at 137:25; (5) a swollen lip, *id.* at 146:10; (6) redness around his neck, which Plaintiff attributed to the grabbing in the clinic, *see id.* at 146:22-24; and (7) unspecified "bruises on [his] body," *id.* at 138:2-3.   Only Plaintiff's swollen lip and other "bruises on [his] body" could reasonably be attributed to events occurring after the handcuffing.   Instead of offering any specific testimony or evidence regarding how he sustained such injuries, Plaintiff testified, "Listen, I don't know what they . . . How do you explain all of the bruises and all of the marks that I have on my body."   Pl's Dep. at 129:24-130:15.   Plaintiff's rhetorical question is insufficient to create a triable issue of fact with respect to any conduct occurring after the handcuffing.

In sum, Plaintiff's claims for excessive force in violation of the Eighth Amendment fail with respect to all defendants, with the exception of his claims regarding the punch in the clinic.

### 2.   Claims for Denial of Medical Care

The Court next considers Plaintiff's claims for denial of medical care relating to (1) the denial of medication for kidney stones and (2) the failure to adequately examine him after the September 10 incident.   To establish a claim, Plaintiff must adduce evidence that one of the officers was personally involved in the deprivation of his medical needs.   *See Colon*, 58 F.3d at 873.   For the reasons that follow, the Court holds that Plaintiff has failed to establish a triable claim for denial of medical care.

The Cruel and Unusual Punishment Clause of the Eighth Amendment imposes a duty upon prison officials to ensure that inmates "receive adequate ... medical care." *Farmer v. Brennan*, 511

U.S. 825, 832 (1994).  "[N]ot every lapse in medical care," however, "is a constitutional wrong." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006).  Rather, a plaintiff must show a "deliberate indifference to [his] serious medical needs," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), which is understood as "the 'unnecessary and wanton infliction of pain'... proscribed by the Eighth Amendment."  *Id.* (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).  A plaintiff must therefore allege both (1) that he suffered an "objectively, sufficiently serious" deprivation of medical care and (2) that the official who caused the harm acted or failed to act with "a sufficiently culpable state of mind," that is, with "deliberate indifference to inmate health or safety."  *Farmer*, 511 U.S. at 834 (internal quotation marks omitted).  A prison official violates the Eighth Amendment only when both the objective and subjective prongs of the test enunciated in *Farmer* are met.

To determine whether an alleged deprivation is "sufficiently serious" under the objective prong, the Court is required "to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."  *Salahuddin*, 467 F.3d at 280 (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993)).  The inquiry "must be tailored to the specific circumstances of each case." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003); *see also Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003) (providing a non-exhaustive list of factors that assist in determining whether a serious medical condition exists).  Generally, however, a deprivation is sufficiently serious when it presents "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (internal quotation marks omitted).

Where the claim concerns the inadequacy of treatment, as opposed to its complete denial, the seriousness inquiry is "narrower," *Salahuddin*, 467 F.3d at 280, and focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract."  *Smith*, 316 F.3d at 185.  The

Second Circuit has found that a delay in medical care constituted a constitutional violation where officials: deliberately held up care as a form of punishment, *see Archer v. Dutcher*, 733 F.2d 14, 16–17 (2d Cir. 1984), ignored a "life-threatening and fast-degenerating" condition, *see Liscio v. Warren*, 901 F.2d 274, 277 (2d Cir. 1990), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009), or delayed major surgery for years, *see Hathaway v. Coughlin*, 841 F.2d 48, 50–51 (2d Cir. 1988).

With respect to *Farmer*'s subjective prong, a plaintiff must establish that "the charged official act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm [would] result." *Salahuddin*, 467 F.3d at 280. Therefore, "'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw such an inference.'" *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998) (quoting *Hathaway*, 99 F.3d at 553). An "inadvertent failure to provide adequate medical care" does not constitute deliberate indifference. *Estelle*, 429 U.S. at 105–06.

### a.  Failure to Receive Medication for Kidney Stones

Plaintiff alleges that "DOC staff . . . neglected to administer the medication he [was] prescribed for his kidney stones," and that, as a result, he suffered from "excruciating pain." SAC at 7. At his deposition, Plaintiff testified that he had kidney stones and had been "sent to [ ] Bellevue [Hospital]" on an unspecified date and "prescribed [medication] by the kidney specialist at Bellevue that [the DOC] needed to give [him] twice a day." Pl.'s Dep. at 115:25-116:8. Because the medication was a "narcotic", "[his] prescription needed to be ren[ewed] every week." *Id.* at 115:21-23, 116:12-13. Based on his medical records, Plaintiff visited the EMTC clinic on September 1, 2015 to seek "renewal of morphine for pain," but was "advised that morphine [would] NOT be renewed", and "[o]ffered another medication which [Plaintiff] refused." Dkt. 83-6 at 8-9 (emphasis in original). Plaintiff then "became verbally loud and angry and had to be escorted from the clinic." *Id.* at 9.

32

Plaintiff visited the clinic again on September 8, 2015, "told the officer he want[ed] to fight" the physician's assistant, and ultimately "[was] escorted out of [the] clinic." *Id.* at 6. The record is not clear as to whether Plaintiff requested a renewal of his prescription on that date as well. *See id.* When Plaintiff next visited the clinic on September 10, 2015, on the date of the incident, to "renew [his] medication," Smith "told [him] to leave [and] that they [were] not going to see [him] and to come the next day." SAC II. Plaintiff alleges that, even after he was escorted out of the clinic, he continued to fight to get back into the clinic because of his kidney stones. *See* Pl.'s Dep. at 125:16-25. Finally, Plaintiff visited the clinic on September 12, 2015, two days after the incident, and was diagnosed as having "renal colic" and "chronic pain syndrome." *See* Dkt. 83-6 at 1. Plaintiff was then prescribed morphine sulfate. *See id.*

As an initial matter, Plaintiff does not allege that any of the four individual defendants acted "while actually aware of a substantial risk" that Plaintiff would suffer serious harm, and thus does not satisfy the subjective prong required to establish a claim for denial of medical care. *Salahuddin*, 467 F.3d at 280. Because Plaintiff does not allege that Officers Ortiz, Mowatt, or Duggins were at all involved in the decision not to renew his prescription, summary judgment is appropriate as to his claims against all three of them. *See Hernandez v. Keane*, 341 F.3d 137, 148 (2d Cir. 2003) (affirming judgment as a matter of law for defendant where there was no evidence that he "played any part in plaintiff's medical care").

Although Plaintiff named Smith in his complaint, *see* SAC II, Plaintiff does not present evidence that establishes that Smith acted with the mental state required to state an Eighth Amendment violation for denial of medical care. In fact, neither party appears to suggest that Smith was present when Plaintiff first learned he would not be prescribed his medication on September 10, 2015. Plaintiff appears to allege that the individual who first informed him that he would not be receiving his medication was male. *See* Pl's Dep. at 114:3-14. Although he maintained in his

Complaint that he "heard a CO misinform the doctor on duty that [he] was seeking pain medication for which he did not have a prescription," SAC at 7, he did not discuss this allegation in his deposition testimony or otherwise suggest that Smith—or any of the other Defendants—were responsible for this purported misinformation.   Defendants maintain that "Captain Smith received a call that the plaintiff was inside the medical clinic and was acting irate and aggressive," 56.1 Stmt. ¶ 24, at which point Smith "spoke with medical staff and learned that the plaintiff had been requesting drugs that the staff was not going to prescribe," *id.* at ¶ 26; *see also* Smith Dep. at 73:16-22 (stating Smith received a call from Officer Palmer regarding Plaintiff's behavior in the clinic).  Smith also stated that she was not "privy" to information about the medication Plaintiff had requested.  *See id.* at 77:24-25.

Plaintiff's injuries, in any case, are not "sufficiently serious" to amount to a constitutional violation.  *Salahuddin*, 467 F.3d at 280.  Although the Court is sympathetic to the fact that Plaintiff experienced pain as a result of his kidney stones, "courts in this district have held that kidney stones fail to satisfy the constitutional 'serious medical need' standard."  *Williams v. Cty. of Orange*, No. 17-CV-8225 (NSR), 2019 WL 1244509, at *3 (S.D.N.Y. Mar. 15, 2019).  In any event, the record does not suggest that Plaintiff was altogether denied medical care for his kidney stones.  Plaintiff testified that he received his prescription from a "kidney specialist at Bellevue [Hospital]," Pl.'s Dep. at 116:7-9.  When a physician refused to renew his prescription on September 8, 2015, that physician "[o]ffered another medication which [Plaintiff] refused."  Dkt. 83-6 at 9.  In this Circuit, "mere disagreement over the proper treatment does not create a constitutional claim.  So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."  *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).  Finally, Plaintiff apparently visited the clinic on September 12, 2015 and was able to renew his prescription.  *See* Dkt. 83-6 at 1.  Thus, the conduct alleged on September 10, 2015, at most, constituted a two-day delay in non-serious medical care, which would not rise to a constitutional

violation. *See, e.g.*, *Heredia v. Doe*, 473 F. Supp. 2d 462, 464 (S.D.N.Y. 2007) (finding that allegation of one-day delay in providing treatment to inmate who slipped and hurt his back failed to state a claim under the Eighth Amendment).

Because Plaintiff has not proffered sufficient evidence to establish that any of the Defendants acted with "a sufficiently culpable state of mind," or that his kidney stones were "sufficiently serious," his claim for denial of medical care under the Eighth Amendment is dismissed.

### b.  Failure to be Treated After the September 10 Incident

Plaintiff also alleges that, after the incident, he was left in handcuffs in the intake cell for "[h]ours," during which time he "told [Defendants] they [b]roke his nose and [he] need[ed] [] medical attention," but once he was taken to the clinic, "the doctor [who] was helping the captain told [him] [he] didn't have [any]thing wrong." SAC II. Plaintiff also stated that the doctor did not examine him, but merely "looked at [him]" before dismissing him. Pl's Dep. at 140:23-24. As a result, Plaintiff claims that he "ha[d] to wait two year[s] suffering" before he found a doctor who operated on his nose. SAC II. The attending surgeon who performed Plaintiff's operation in 2017 wrote that Plaintiff "note[d] facial trauma with the nasal bone fracture two years ago, ha[d] had persistent airway deformities and difficulty breathing, [and] ha[d] required [] sinus medications with no relief." SAC at 9.

This claim for denial of medical care similarly cannot withstand summary judgment because he has not produced evidence that any of the named individual defendants were involved in the alleged two-year delay of medical care. Nowhere in the record does Plaintiff allege that he even informed any defendant about his injuries during that period. No reasonable juror could therefore conclude that Smith, Duggins, Ortiz, or Mowatt "act[ed] or fail[ed] to act while actually aware of a substantial risk that serious . . . harm [would] result." *Salahuddin*, 467 F.3d at 280.

To the extent that the Complaint alleges that a doctor failed to provide him for adequate medical care, that claim is still insufficient. First, Plaintiff does not name any doctor as a defendant in this action. Second, Plaintiff's complaint states only that "the doctor [that] was helping the captain told [him] [he] didn't have [any]thing wrong." SAC II. Plaintiff does not allege that this unnamed doctor believed, contrary to the purported diagnosis, that Plaintiff faced a substantial risk of serious harm. Accordingly, no reasonable juror could conclude on this record that any of the involved parties acted or failed to act with "a sufficiently culpable state of mind," that is, with "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834 (internal quotation marks omitted); *see also Hernandez v. Goord,* No. 01 CIV. 9585 (SHS), 2013 WL 2355448, at *11 (S.D.N.Y. May 29, 2013) (granting summary judgment where Plaintiff "did not name either the nurse or the doctor who attended him as defendants" and "[did] not allege any conduct by any named defendant that a reasonable juror could construe as deliberate indifference to serious medical needs").

In light of Plaintiff's failure to establish the subjective component of his denial of medical care claim, the Court need not reach the objective component. *See Salahuddin*, 467 F.3d at 281 (affirming summary judgment after finding "no genuine factual issue to be tried as to the subjective element" of a claim for denial of medical care).

In sum, Plaintiff's claims for denial of medical care fail insofar as Plaintiff maintains that Defendants (1) failed to treat his kidney stones on the day of the incident and (2) failed to treat his broken nose after the incident. Summary judgment is thus granted as to all defendants.

**CONCLUSION**

For the foregoing reasons, the Court holds that Defendants are entitled to summary judgment as a matter of law with respect to all of Plaintiff's claims of excessive force with the exception of his claims against Smith and Duggins regarding the punch in the clinic.  Defendants are also entitled to summary judgment on Plaintiff's claims for denial of medical care.

SO ORDERED.

Dated:      November 18, 2020
            New York, New York

_____
Ronnie Abrams
United States District Judge