UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARCELINO CASTRO,

          *Plaintiff,*

- v. -

CAPTAIN JANET SMITH and CORRECTIONS OFFICER OCTAVIAN DUGGINS,

          *Defendants.*

Case No. 16-CV-8147 (RA)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS FOR SPOLIATION OF ELECTRONICALLY STORED INFORMATION**

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
(212) 403-1000 (phone)
(212) 403-2000 (fax)

Dated:  May 5, 2023

*Attorneys for Plaintiff Marcelino Castro*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND .......................................................................................................................... 2

    A.    The September 10, 2015 Incident .................................................................................. 2

    B.    Video Footage of the Incident ....................................................................................... 3

    C.    Notice of Potential Claims ............................................................................................. 4

    D.    Destruction of the Video Footage ................................................................................. 5

ARGUMENT ................................................................................................................................. 6

    A.    An Adverse Inference Is Warranted Here ..................................................................... 6

        1.    DOC was obligated to preserve the video footage ................................................ 6

        2.    DOC failed to take reasonable steps to preserve the footage ................................ 7

        3.    The video footage cannot be restored. .................................................................. 8

        4.    DOC intended to deprive Mr. Castro of the ESI. .................................................. 9

    B.    DOC Should Be Sanctioned Even If It Did Not Intend to Deprive Mr. Castro of the Video Footage ............................................................................................................. 10

        1.    Prejudice to Mr. Castro ........................................................................................ 11

        2.    Appropriate Sanctions ......................................................................................... 12

    C.    The DOC's Spoliation Is Properly Attributable to Defendants ................................... 13

    D.    Mr. Castro's Motion Is Timely .................................................................................... 15

CONCLUSION ............................................................................................................................ 16

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Cedar Petrochemicals, Inc.* v. *Dongbu Hannong Chem. Co.*,
  769 F. Supp. 2d 269 (S.D.N.Y. 2011) ................................................................................6

*Charlestown Cap. Advisors, LLC* v. *Acero Junction, Inc.*,
  337 F.R.D. 47 (S.D.N.Y. 2020) ....................................................................................8, 10

*Gross* v. *Lunduski*,
  304 F.R.D. 136 (S.D.N.Y. 2014) .....................................................................................14

*Guillory* v. *Skelly*,
  No. 12-cv-00847, 2014 WL 4542468 (W.D.N.Y. Sept. 11, 2014) ...................................14

*Hughes* v. *City of New York*,
  No. 18-cv-09380, 2021 WL 4295209 (S.D.N.Y. Sept. 21, 2021) ..................................7, 8

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  341 F.R.D. 474 (S.D.N.Y. 2022) .....................................................................................13

*In re Terrorist Attacks on Sept. 11, 2001*,
  No. 03-MD-1570, 2018 WL 4096106 (S.D.N.Y. Aug. 27, 2018) ....................................15

*Karsch* v. *Blink Health Ltd.*,
  No. 17-cv-03880, 2019 WL 2708125 .......................................................................11, 13

*Kronisch* v. *United States*,
  150 F.3d 112 (2d Cir. 1998) .............................................................................................11

*Leidig* v. *Buzzfeed, Inc.*,
  No. 16-cv-00542, 2017 WL 6512353 (S.D.N.Y. Dec. 19, 2017) ...................................7, 8

*Linde* v. *Arab Bank, PLC*,
  706 F.3d 92 (2d Cir. 2013) ...............................................................................................13

*Man Zhang* v. *City of New York*,
  No. 17-cv-05415, 2019 WL 3936767 (S.D.N.Y. Aug. 20, 2019) ....................................12

*Moody* v. *CSX Transp., Inc.*,
  271 F. Supp. 3d 410 (W.D.N.Y. 2017) ..............................................................................9

*Nieves* v. *City of New York*,
  208 F.R.D. 531 (S.D.N.Y. 2003) .....................................................................................15

*Ransom* v. *Andrews*,
　No. 21-cv-06343, 2022 WL 16555362 (S.D.N.Y. Oct. 31, 2022) ..................................... 11, 12

*Ronnie Van Zant, Inc.* v. *Pyle*,
　270 F. Supp. 3d 656 (S.D.N.Y. 2017) ........................................................................................ 10

*Stanbro* v. *Westchester Cnty. Health Care Corp.*,
　No. 19-cv-10857, 2021 WL 3863396 (S.D.N.Y. Aug. 27, 2021) ............................................. 14

*Taylor* v. *City of New York*,
　293 F.R.D. 601 (S.D.N.Y. 2013) ............................................................................................ 6, 7

**Rules and Statutes**

Fed. R. Civ. P. 37(e) ................................................................................................................... 7, 10

Fed. R. Civ. P. 37(e)(1) .................................................................................................................. 10

Fed. R. Civ. P. 37(e)(2) .................................................................................................................... 6

**PRELIMINARY STATEMENT**

Plaintiff Marcelino Castro, by his undersigned counsel, respectfully moves this Court for an order allowing him to present evidence at trial regarding the destruction of video footage of the very incident at issue in this case and an instruction that the jury may draw an adverse inference against Defendants as a result of its destruction.

Mr. Castro's claims arise from a blow to the nose that he sustained during a September 10, 2015 altercation (the "September 10, 2015 Incident") with New York City Department of Correction ("DOC") officers at the Eric M. Taylor Center, a DOC facility on Rikers Island. During the September 10, 2015 Incident, a corrections officer called to assist recorded some portion of the incident using a handheld video camera. But the video footage recorded that day was never produced to Mr. Castro. Roughly three months after the September 10, 2015 Incident, DOC destroyed this footage after being on notice that Mr. Castro might bring suit. Sanctions for this failure to preserve evidence are warranted for the following reasons:

*First*, DOC had an obligation to preserve the video footage. There is no dispute that Mr. Castro informed DOC soon after the September 10, 2015 Incident that he had been injured. Courts within this district have found that this alone suffices to put DOC on notice that it may be sued, triggering an obligation to preserve all relevant evidence. Regardless, in the weeks following the incident, Mr. Castro filed an inmate grievance with DOC and caused the Legal Aid Society to send a letter to DOC requesting the preservation of evidence related to the September 10, 2015 Incident. Those acts too put DOC on notice. Yet, despite this extensive notice, DOC later destroyed the video.

*Second*, DOC intended to deprive Mr. Castro of the video footage. While there is no single document in which DOC employees expressly state their intent to deprive Mr. Castro

1

of the footage, the record makes that intent clear.  In the weeks following the September 10, 2015 Incident, one DOC employee attempted to paint the video footage as favorable to DOC, only to later admit that he had not reviewed it.  Others claimed that no video footage existed, despite having reviewed multiple reports referring to such footage.  DOC's intent to deprive Mr. Castro of the video footage warrants a sanction of an adverse inference that the destroyed footage was unfavorable to DOC.

*Third*, the destruction of the video footage prejudiced Mr. Castro.  Even if the DOC did not intend to deprive Mr. Castro of the video footage, sanctions would remain appropriate because Mr. Castro has been prejudiced.  Mr. Castro need not establish that the video footage was beneficial to him to make this showing.  The destruction of evidence that *could* have shown the blow to his nose or the extent of his injury constitutes prejudice.

*Fourth*, the destruction of the video footage can be attributed Defendants Smith and Duggins.  Although DOC is no longer a party to this litigation, there remains an alignment of interests between DOC and Defendants Smith and Duggins such that DOC's spoliation of evidence merits sanctions for those Defendants.

## BACKGROUND

A.   The September 10, 2015 Incident

Mr. Castro alleges that, during an altercation with corrections officers at the Eric M. Taylor Center, a DOC facility on Rikers Island, a corrections officer punched him in the nose and that the officer did so after another officer, or possibly the same officer, had grabbed him by the neck.  *See* Second Amended Complaint (hereafter, "SAC") at 7; Ex. A to Declaration of Ethan P. Amaker at 128:24–129:23 (hereafter, "Ex. A").  The blow left Mr. Castro with a bloody

2

nose and with internal injuries that eventually required corrective surgery.  *See* SAC at 7; Ex. B 5:12–18.

Defendants admit that Mr. Castro was struck on the nose, but contest the circumstances surrounding the punch and the extent of Mr. Castro's injuries.  According to Defendants, Captain Smith struck Mr. Castro inadvertently while attempting to create physical space between herself and Mr. Castro.  *See* Ex. C at 122:8–16.  The incident reports are silent as to whether Mr. Castro had a bloody nose.  When deposed years after the incident, however, several of the corrections officers present during the incident said that Mr. Castro did not have a bloody nose.  *See* Exs. D at 124:3–9; E at 100:4–5.  Other officers said they had no independent recollection of whether the strike left Mr. Castro with a bloody nose.  *See* Exs. C at 126:9–13; F at 47:9–23.

There is no dispute, however, that DOC arranged for Mr. Castro to be seen by its medical staff at Rikers Island hours after the incident for an examination of Mr. Castro's reported injury.  *See* Ex. G.

**B.     Video Footage of the Incident**

In September 2015, no camera was mounted in the Rikers Island medical unit where the incident took place.  *See* Ex. F at 45:18–46:2.  But at some point during the September 10, 2015 Incident, Officer Tracy Storey, a member of the "Probe Team" dispatched to the medical unit in response to calls from corrections officers, brought a handheld video camera to the unit and began to record video footage upon her arrival.  *See* Ex. H at D000027; *see also* Ex. I (entry from DOC "Alarm Response Logbook" indicating that Probe Team was dispatched to the incident and that the team captured video footage).  While it is not clear from the record

3

exactly when her recording began, Officer Storey indicated in her report that she arrived at some point prior to Mr. Castro being handcuffed.  See Ex. H at D000027.

In a September 22, 2015 report to Monica Windley, the Warden of EMTC, Captain David Levy, the DOC officer tasked with investigating the use of force against Mr. Castro, stated that "[w]hen viewing the handheld video camera, the visual evidence coincides with staff reports."  Ex. J at D000014.  Reports prepared by Captain Levy's superiors days later read as though the video footage never existed, despite these superiors having reviewed Captain Levy's findings.  The September 24, 2015 Tour Commander's Report prepared by Assistant Deputy Warden Keesha Nance, for example, states that "[t]here was no video surveillance" of the September 10, 2015 Incident.  See Ex. K (Tour Commander's Report noting that Assistant Deputy Warden Nance had reviewed "the investigation conducted by Captain Levy").  And the October 9, 2015 memorandum from Warden Windley to the DOC's Bureau Chief of Security states that there is "[n]o video footage to review."  Ex. L; see Ex. K (Facility Commander's Report noting that Warden Windley had reviewed "staff report[s]" and "the investigation conducted").

Under oath, Captain Levy later admitted that despite his report citing the video, he had not reviewed the footage captured by the Probe Team and that DOC policy barred him from accessing footage captured by handheld video cameras.  See Ex. F at 44:21–45:17.

C.   **Notice of Potential Claims**

On October 6, 2015, the Legal Aid Society, acting on behalf of Mr. Castro, sent a letter to DOC requesting an investigation of the September 10, 2015 Incident and asking DOC to confirm that it "will take steps to preserve all photographs and to properly investigate Mr. Castro-Martinez's allegations."  Ex. M at D000056.  While DOC does not appear to have

4

responded to the Legal Aid Society letter, the DOC's production of that document to Mr. Castro confirms that DOC received the letter.

On October 28, 2015, Mr. Castro then submitted an Inmate Grievance and Request Program Statement Form to DOC.  *See* Ex. N.  In his grievance, Mr. Castro wrote that a corrections officer punched him in the face and broke his nose without reason.  *See id.*

### D. Destruction of the Video Footage

Mr. Castro filed his initial complaint in this lawsuit on October 18, 2016.  In connection with this action, Defendants have produced over 2,700 pages of documents, including photographs of Mr. Castro taken the day of the incident.  Defendants have also produced audio recordings of interviews of Mr. Castro made in connection with DOC's investigation of the September 10, 2015 Incident.  Absent from Defendants' production is the video footage captured by the Probe Team.

With respect to the video footage, Defendants have produced a declaration from DOC.  *See* Ex. O.  In that declaration, Officer Kim stated that he reviewed the DOC computer server "where videos are archived," that the server contained "no record of any video associated with" the September 10, 2015 Incident, and that any such video "would have been deleted."  *Id.* Per DOC policy, such destruction would have been 90 days after the date the video footage was taken, *i.e.* December 10, 2015.  *See* Ex. P.  That date is, of course, long after DOC was on notice of Mr. Castro's potential claim and after senior DOC officers either outright lied concerning the video or failed to seek to review it despite a responsibility to investigate the blow to Mr. Castro.

## ARGUMENT

### A.   An Adverse Inference Is Warranted Here

Under Federal Rule of Civil Procedure 37(e), an adverse inference that lost electronically stored information ("ESI"), such as video footage, was "unfavorable" to the party responsible for the loss is appropriate where 1) the ESI "should have been preserved in the anticipation or conduct of litigation," 2) the loss is due to that party's failure "to take reasonable steps to preserve" the ESI, 3) the ESI "cannot be restored or replaced through additional discovery," and 4) the party responsible for the loss "acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). Such is the case here.

#### 1.   DOC was obligated to preserve the video footage.

DOC's obligation to preserve the video footage of the incident arose the moment Mr. Castro was injured. When a party knows that "certain types of incidents tend to trigger litigation" against it and that party has recorded video footage of such an incident, "a duty to preserve relevant video footage may attach as soon as the triggering incident occurs and prior to when a claim is filed." *Taylor* v. *City of New York*, 293 F.R.D. 601, 610 (S.D.N.Y. 2013) (Patterson, J.). And the more "sophisticated" a party is, the better it should understand its obligation to preserve documents when the prospect of litigation looms. *See Cedar Petrochemicals, Inc.* v. *Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 289 (S.D.N.Y. 2011).

There is no doubt that at some point during the September 10, 2015 Incident or shortly thereafter, Mr. Castro told DOC officers that he had been injured. The record shows that DOC officers arranged for Mr. Castro to undergo an examination of his nose at a medical clinic hours after the incident. *See* Ex. G. During that examination, Mr. Castro repeated his claim that he had been injured to DOC medical staff. *See id.*

At the time of the September 10, 2015 Incident, DOC knew from "hundreds" of other cases that injuries suffered by persons in DOC custody "invariably" led to lawsuits by those persons against DOC. *See Taylor*, 293 F.R.D. at 610. Accordingly, DOC "should have reasonably anticipated that Plaintiff would file a lawsuit," and that it would, thus, need to take steps to preserve all video footage relating to the injury. *Id.*

But Mr. Castro did not leave it to chance that the City would preserve records relevant to his injury. While DOC was put on notice that Mr. Castro might sue moments after his injury, Mr. Castro took further action to ensure that DOC preserved all materials relating to the September 10, 2015 Incident. At Mr. Castro's request, the Legal Aid Society sent a letter to DOC on October 6, 2015. *See* Ex. M at D000056. That letter requested that DOC investigate the September 10, 2015 Incident and asked the DOC to "take steps to preserve all photographs." *Id.*[1]

In sum, DOC was put on notice that Mr. Castro might sue and, thus, had an obligation to preserve the video footage under Rule 37(e).

### 2. DOC failed to take reasonable steps to preserve the footage.

Once the duty to preserve relevant ESI arises, the party in possession of the ESI must take "reasonable steps" to preserve it. Fed. R. Civ. P. 37(e). Courts have equated the "reasonable steps" inquiry to "roughly a negligence standard." *Hughes* v. *City of New York*, No. 18-cv-09380, 2021 WL 4295209, at *11 (S.D.N.Y. Sept. 21, 2021) (Vyskocil, J.) (quoting *Leidig* v. *Buzzfeed, Inc.*, No. 16-cv-00542, 2017 WL 6512353, at *10 (S.D.N.Y. Dec. 19, 2017)). Once the duty to preserve ESI attaches, "any destruction of documents is, at a minimum,

---

[1] Although the Legal Aid Society letter refers to photographs only, the letter put DOC on notice that Mr. Castro might bring litigation. Accordingly, DOC had a duty to preserve all relevant ESI, including the video footage captured by the Probe Team.

7

negligent." *Id.* (quoting *Charlestown Cap. Advisors, LLC* v. *Acero Junction, Inc.*, 337 F.R.D. 47, 61 (S.D.N.Y. 2020)).

While there is no clear account of the City's efforts to preserve relevant evidence, the record here reveals the City's failure to take reasonable steps to preserve that evidence. As of September 2015, the DOC's policy was to delete footage from handheld video cameras "within ninety days" of its creation absent a request from a DOC facility to preserve the footage. Ex. P. On March 31, 2017, the DOC stated it had "no record of any video associated" with the September 10, 2015 use of force incident, "including . . . handheld video or any other video from EMTC, Old Clinic." Ex. O. According to the DOC, the handheld video footage would have been deleted automatically pursuant to DOC policy on or about December 9, 2015. *See* Exs. O; P.

As courts within this district have found in similar cases, these facts alone establish the DOC's failure to take reasonable steps to preserve ESI. In *Hughes* v. *City of New York*, for example, the New York Police Department deleted 9-1-1 calls and radio transmissions sought by the plaintiff in connection with claims alleging violations of his constitutional rights and did so *after* receiving the plaintiff's notice of claim. *See* 2021 WL 4295209, at *12. The Department's failure to suspend its routine document retention and destruction policies after receiving a notice of claim constituted an "irrefutabl[e]" failure to take reasonable steps to preserve ESI. *See id.* at *12–13.

### 3. The video footage cannot be restored.

Per DOC, video footage of the September 10, 2015 Incident is not stored on the DOC computer server that houses such ESI. *See* Ex. O. That footage was "deleted automatically" pursuant to DOC policy. *See id.*

8

### 4. DOC intended to deprive Mr. Castro of the ESI.

While speculation alone will not suffice to establish a party's intent to deprive another of ESI, direct evidence is not a requirement. Circumstantial evidence can also form the basis for a finding of an intent to deprive. *See, e.g.*, *Moody* v. *CSX Transp., Inc.*, 271 F. Supp. 3d 410, 431–32 (W.D.N.Y. 2017) (finding intent to deprive where defendants allowed ESI on a locomotive engine's "black box" to be overwritten, "destroyed or recycled" a laptop to which the ESI had been uploaded without first "confirming that the [ESI] had been properly preserved in another repository," and "fail[ed] to make any effort over the course of four years to confirm that the data was properly preserved"). The circumstantial evidence here does just that.

Most notably, corrections officers responsible for investigating DOC's use of force against Mr. Castro either lied about the video or failed to make any effort to review it. The first superior officer to investigate the incident promptly characterized the video footage as "coincid[ing] with staff reports." Ex. J at D000014. But at deposition, this officer remarkably admitted that he made this statement without having set eyes on the footage. *See* Ex. F at 44:21–45:17. The superiors who reviewed that officer's account changed tack, instead reporting that no such footage existed, even though their reports were prepared before the 90-day deletion period expired. *See* Exs. K; L. DOC's selective preservation of evidence further demonstrates its intent to deprive Mr. Castro of the video footage. The City destroyed the only ESI that captured some portion of the September 10, 2015 Incident, while somehow preserving every other form of ESI created in connection with the incident, including photographs taken the day of the incident and audio recordings of interviews of Mr. Castro made just eight days after the incident. *See* Ex. Q (photographs of Mr. Castro and corrections officers taken on September 10, 2015); Ex. R (photographs of Plaintiff taken in February 2016); Ex. S (compact disc containing audio

9

recording of February 2016 interview of Mr. Castro by DOC investigators); Ex. T (letter from Defendants to Mr. Castro regarding production of September 2015 audio recordings).

When, as here, a party selectively complies with their obligation to preserve evidence, destroying some evidence while preserving other evidence, such action "evince[s] the kind of deliberate behavior that sanctions are intended to prevent and weigh in favor of an adverse inference." *Ronnie Van Zant, Inc.* v. *Pyle*, 270 F. Supp. 3d 656, 670 (S.D.N.Y. 2017) (Sweet, J.) (finding intent to deprive where sanctioned party had backed-up pictures stored on his mobile phone but did not backup text messages also stored on the phone), *rev'd on other grounds sub nom. Ronnie Van Zant, Inc.* v. *Cleopatra Records, Inc.*, 906 F.3d 253 (2d Cir. 2018).

### B. DOC Should Be Sanctioned Even If It Did Not Intend to Deprive Mr. Castro of the Video Footage

The "intent to deprive" another party of ESI is not a prerequisite for sanctions under Rule 37(e). Even the unintentional loss of ESI will merit sanctions when said loss results in "prejudice to another party." Fed. R. Civ. P. 37(e)(1). In such a scenario, a court "may order measures no greater than necessary to cure the prejudice." *Id.* Examples of sanctions under Rule 37(e)(1) include forbidding parties that failed to preserve the ESI from putting on certain evidence and permitting prejudiced parties to put on evidence regarding the loss of the ESI. *Charlestown Cap. Advisors, LLC*, 337 F.R.D. at 67–68.

In the event this Court finds the destruction of the September 10, 2015 video footage in violation of the DOC's obligation to preserve that ESI to be the product of negligence or gross negligence rather than an intent to deprive, Mr. Castro should be permitted to introduce evidence that video footage of the September 10, 2015 Incident existed and that it was subsequently destroyed by DOC.

### 1. Prejudice to Mr. Castro

As the footage has been destroyed, there is no way to know whether it would have proved or disproved Mr. Castro's account of the September 10, 2015 Incident. But Mr. Castro does not need to establish that the video footage would have constituted a smoking gun in order to obtain curative sanctions. In fact, the Second Circuit has cautioned district courts against "holding the prejudiced party to too strict a standard of proof regarding the likely contents of . . . destroyed evidence." *Kronisch* v. *United States*, 150 F.3d 112, 128 (2d Cir. 1998); *see also Karsch* v. *Blink Health Ltd.*, No. 17-cv-03880, 2019 WL 2708125, at *21 (S.D.N.Y. June 20, 2019) ("It is sufficient [for a finding of prejudice] if the existing evidence plausibly suggests that the spoliated ESI *could* support the moving party's case." (emphasis added) (internal quotations omitted)).

Here, there is evidence that the destroyed video footage "could" have supported Plaintiff's case. Defendants contest the severity of the blow to Mr. Castro's nose. As Mr. Castro described in an interview five months after the September 10, 2015 Incident, the strike left him bloody and "leaking because somebody with . . . force [was] hitting me on my nose." Ex. B at 5:12–18. The destroyed video contains images of Mr. Castro's nose mere moments after that strike.[2] As courts in this district have found on similar facts, the destruction of this video footage deprived Mr. Castro of "relevant, non-cumulative, and potentially powerful evidence" and thus constitutes prejudice. *See Ransom* v. *Andrews*, No. 21-cv-06343, 2022 WL 16555362, at *4 (S.D.N.Y. Oct. 31, 2022) (Moses, M.J.).

---

[2] Although some corrections officers testified that they saw no blood during the September 10, 2015 Incident, their testimony came years after the incident. *See* Exs. D at 124:3–9 (July 2019 deposition of Corrections Officer Duggins); E at 100:4–5 (March 2018 deposition of Captain Lenza). Those officers' contemporaneous reports are silent as to the appearance of Mr. Castro's nose and neglect to mention the strike to his nose at all. *See* Exs. U; V.

11

In *Ransom* v. *Andrews*, for example, the court found that the plaintiff in a suit against a corrections officer at Rikers Island alleging deliberate indifference was prejudiced by the spoliation of video footage that could have proved plaintiff's allegations that he had been "placed in his cell" while handcuffed, thus "making him vulnerable to attack" and that the defendant then "failed to intervene" after the plaintiff was attacked by another inmate. *Id.* at *5. And in *Man Zhang* v. *City of New York*, the court found that the plaintiffs in a suit against *inter alia* DOC alleging that DOC failed to provide adequate medical care, were prejudiced by the spoliation of video footage that *could* have corroborated disputed testimony that plaintiffs' decedent had "consistently complained of chest pain" in the months before he died, while detained, of heart disease. No. 17-cv-05415, 2019 WL 3936767, at *8 (S.D.N.Y. Aug. 20, 2019) (emphasis added) (internal quotation omitted).

    **2.**    **Appropriate Sanctions**

        **(i)**    **DOC Should Be Barred from Presenting Evidence Regarding Its Investigation of the September 10, 2015 Incident**

DOC's handling of the video footage of the September 10, 2015 Incident reveals its investigations of the September 10, 2015 Incident—one led by Captain Levy just weeks after the incident and another led by DOC Investigator Anthony Sewer in early 2016—to be incomplete. With respect to the first investigation, no DOC officers appear to have reviewed the footage at all. While Captain Levy promptly described the video footage as "coincid[ing] with staff reports," Ex. J at D000014, he appears to have spun that account out of whole cloth. At deposition, this officer remarkably admitted that he made this statement without having set eyes on the footage. *See* Ex. F at 44:21–45:17. The superiors who reviewed Captain Levy's account changed tack, instead reporting that no such footage existed, even though their reports were

12

prepared before the 90-day deletion period expired.  *See* Exs. K; L.  By the time the second investigation began in February 2016, the video footage had already been deleted.

Should the Defendants seek to introduce evidence relating to DOC's investigations of the September 10, 2015 Incident, specifically DOC's findings that the use of force against Mr. Castro was appropriate and that Mr. Castro was not injured during the incident, *see* Exs. K; W, the destruction of the video footage would seriously undermine Mr. Castro's ability to rebut that evidence.  The appropriate remedy is an order prohibiting Defendants from presenting evidence relating to DOC's review of the September 10, 2015 incident.

### (ii) Mr. Castro Should Be Permitted to Introduce Evidence Regarding the Destruction of the Video Footage

Courts routinely correct the "evidentiary imbalance[s]" created by spoliators by permitting prejudiced parties to present evidence at trial regarding the loss of the spoliated evidence.  *See, e.g.*, *Karsch*, 2019 WL 2708125, at *27 (quoting *Linde* v. *Arab Bank, PLC*, 706 F.3d 92, 102 (2d Cir. 2013)); *see also, e.g.*, *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 528–29 (S.D.N.Y. 2022).

Permitting Mr. Castro to introduce evidence regarding the lost video footage would "provide[] the jury, as finder of fact, with context" for the "evidentiary imbalance" caused by Defendants' spoliation "which is itself relevant evidence going to the parties' credibility and other factual issues."  *Karsch*, 2019 WL 2708125, at *27.  Such a remedy would also leave this Court "free to determine the precise scope of the spoliation evidence to be permitted at trial and to craft any related jury instructions on a full evidentiary record."  *Id.*

### C. The DOC's Spoliation Is Properly Attributable to Defendants

Where a plaintiff sues corrections officers in their individual capacities [for a violation of the plaintiff's constitutional rights] and the department of corrections that employs

13

those officers is found to have spoliated relevant evidence, that spoliation is properly attributed to the officer defendants where the interests of the officers and the department are "sufficiently aligned and closely interrelated." *Gross* v. *Lunduski*, 304 F.R.D. 136, 143 (S.D.N.Y. 2014). Here, the New York City Law Department's representation of Officers Duggins and Smith demonstrates that the City of New York, and thus DOC as a department thereof, has a substantial interest in the case. *See Gross*, 304 F.R.D. at 143 (New York Attorney General's representation of state corrections officers evidences department of correction's interest in litigation against the individual officers).

In determining whether to impute a department of corrections' spoliation of evidence to officer defendants, courts also consider the defendants' "practical ability" to obtain evidence from their employer. *See, e.g.*, *Stanbro* v. *Westchester Cnty. Health Care Corp.*, No. 19-cv-10857, 2021 WL 3863396, at *9 (S.D.N.Y. Aug. 27, 2021). This too weighs in favor of imputing DOC's spoliation of ESI to Officers Duggins and Smith. In representing those officers, the Law Department has produced other evidence in this litigation, such as audio recordings and photographs of Mr. Castro, that were in DOC's physical custody. Officers Duggins and Smith's ability to obtain this evidence for use in the instant litigation through their counsel, the Law Department, shows that they could have obtained the video footage at issue here had it not been destroyed. *See Guillory* v. *Skelly*, No. 12-cv-00847, 2014 WL 4542468, at *8 (W.D.N.Y. Sept. 11, 2014) (finding that individual corrections officer defendants had control of spoliated evidence where "the production of other documents in th[e] action — through the intermediation of the Attorney General who represents both [the state department of correction] and Defendants — was necessarily from [the state department of correction], rather than Defendants"). Indeed, it would be quite an unfair imbalance if Defendants could use the ESI that

14

DOC did preserve without bearing any adverse consequence from DOC's failure to preserve other ESI.

### D. Mr. Castro's Motion Is Timely

While courts within this district have denied as untimely motions for Rule 37 sanctions filed "years after the alleged misconduct," *e.g.*, *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MD-1570, 2018 WL 4096106, at *2 (S.D.N.Y. Aug. 27, 2018), the concerns animating such rulings are not present here. This is not, for example, a case in which bringing this motion earlier would have enabled this Court to "obtain compliance with [its] discovery orders," a key purpose of Rule 37 sanctions. *Id.* (quoting *Nieves* v. *City of New York*, 208 F.R.D. 531, 535 (S.D.N.Y. 2003)). Here, DOC destroyed the footage in or about December 2015, *see* Exs. O; P, nearly a year before Mr. Castro filed the complaint that initiated this suit. By the time discovery commenced in this litigation, the footage had long since been destroyed.

An award of sanctions here would still achieve other stated purposes of Rule 37 sanctions, namely "ensuring [that] the disobedient party does not benefit from non-compliance" and "providing a general deterrent in the particular case and litigation in general." *In re Terrorist Attacks*, 2018 WL 4096106, at *2 (quoting *Nieves*, 208 F.R.D. at 535). As discussed above, Mr. Castro has been prejudiced by the destruction of the video footage. An adverse inference that the video footage was unfavorable to the Defendants or, at the very least, an order permitting Mr. Castro to present evidence at trial regarding the lost footage would ensure that Defendants draw no benefit from its destruction. And while an award of sanctions may do little to deter Defendants in *this* litigation, it will serve to deter the DOC and its officers from spoliating ESI in the future.

15

## CONCLUSION

For the reasons set forth above, this Court should grant Plaintiff Marcelino Castro's motion for sanctions and issue an adverse inference instruction at trial and permit Plaintiff Marcelino Castro to present evidence at trial that video footage of the September 10, 2015 Incident existed and that it was subsequently destroyed by the DOC.

Dated: New York, New York
       May 5, 2023

WACHTELL, LIPTON, ROSEN & KATZ

By:  /s/ Ethan P. Amaker
     Jonathan M. Moses (JM 9049)
     Ethan P. Amaker (admitted *pro hac vice*)

51 West 52nd Street
New York, New York  10019
Telephone:  (212) 403-1000
Fax:  (212) 403-2000

*Attorneys for Plaintiff Marcelino Castro*