UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARCELINO CASTRO,<br><br>                    Plaintiff,<br><br>          -against-<br><br>CAPTAIN JANET SMITH AND CORRECTIONS<br>OFFICER OCTAVIAN DUGGINS,<br><br>                    Defendants. | 16-CV-8147 (JGLC)<br><br>**<u>OPINION AND ORDER</u>** |

JESSICA G. L. CLARKE, United States District Judge:

Currently before the Court is a motion filed by Plaintiff Marcelino Castro ("Plaintiff"), ECF No. 123, seeking spoliation sanctions pursuant to Federal Rule of Civil Procedure 37(e) against Defendants Captain Janet Smith ("Smith") and Corrections Officer Octavian Duggins ("Duggins") (collectively, "Defendants") as a penalty for the alleged destruction of video footage of the incident at issue in this case. Plaintiff moves for the Court to issue an instruction that the jury may draw an adverse inference against Defendants as a result of the alleged destruction, to bar Defendants from presenting evidence regarding the investigation of the September 10, 2015 incident (the "Incident") by the New York City Department of Corrections (the "DOC") and to allow Plaintiff to present evidence regarding the alleged destruction of the video footage. For the reasons stated herein, Plaintiff's motion for sanctions is GRANTED in part and DENIED in part.

**BACKGROUND**

The facts of this case have been previously described in the Court's summary judgment ruling. Opinion & Order, ECF No. 96 ("Summ. J. Op."). As such, the Court repeats only the relevant facts here.

I.      **The September 10, 2015 Incident**

The incidents giving rise to Plaintiff's lawsuit occurred when Plaintiff was incarcerated at the Eric M. Taylor Center ("EMTC") on Rikers Island. Second Amended Complaint, ECF No. 23 ("SAC"); ECF No. 83-3 ("Pl. Dep.") 93:20–24. On September 10, 2015, Plaintiff went to the clinic to "ask for [his] medication." *Id*. 113:7–8. Plaintiff then "wait[ed] in line for sick call for approximately 40 minutes," until Plaintiff was informed that the doctor was not going to give him the medication Plaintiff was requesting. SAC at 7; Pl. Dep. 114:3–6.

At approximately 11:15 a.m., Smith "received a call that [Plaintiff] was inside the medical clinic and was acting irate and aggressive." Defs. Rule 56.1 Statement, ECF No. 82 ("56.1 Stmt.") ¶ 24. Smith went to the clinic where Plaintiff was "yelling and screaming, saying he wanted his medication." ECF No. 83-7 ("Smith Dep.") 77:3–4. Upon speaking to the doctor, Smith "learned that [Plaintiff] had been requesting drugs that the staff was not going to prescribe" and that Plaintiff "had previously threatened a medical staff member inside the clinic." *Id*. 77:7–21; 56.1 Stmt. ¶ 26. Plaintiff instead maintains that he was at the clinic to ask the doctor to renew his prescription and that he "heard a CO misinform the doctor on duty that [he] was seeking pain medication for which he did not have a prescription." Pl. Dep. 114:13–14, 116:22–25; SAC at 7.

Smith returned to Plaintiff and told him that she was going to take him back to his housing area, but that she would bring him back to the clinic before she left the facility. Smith Dep. 78:10–14, 80:14–19; ECF No. 83-8 ("Duggins Dep.") 83:9–14. Plaintiff contends that Smith told him to come back the next day. Second Amended Complaint II, ECF No. 33 ("SAC II"). Plaintiff refused to leave, explaining that he was prescribed medication for his kidney stones that DOC had neglected to administer. SAC at 7; Pl. Dep. 117:1–7.

Defendants maintain that Plaintiff then threatened to choke Smith. Smith Dep. 80:9–12; Duggins Dep. 91:10–15. After Plaintiff argued with Smith for approximately five minutes, Smith "grabbed [him] by the neck." 56.1 Stmt. ¶ 35; Pl. Dep. 117:7–10. Plaintiff contends he responded "quick" by "push[ing] [Smith's] hand out." *Id.* 121:2–9. Defendants assert that though Plaintiff appeared to briefly comply with orders to leave the clinic, as Plaintiff and Smith were about to walk out of the clinic, Plaintiff turned around and tried to strike Smith, but missed. 56.1 Stmt. ¶ 36; Smith Dep. 81:20–82:2. Officers then put Plaintiff up against the wall and Smith warned that she was "going to utilize chemical agents." *Id.* 83:7–23; Duggins Dep. 83:22–84:3. Plaintiff knocked the chemical agent out of Smith's hand. Smith Dep. 84:12–17; ECF No. 83-9 ("Ortiz Dep.") 98:17–18.

Plaintiff's and Defendants' accounts of what happened next diverge, though all agree that Plaintiff was subsequently hit in the face. In the Complaint, Plaintiff alleges that Smith punched him in the face, but Plaintiff testified in his deposition that the "officer working in the back, he punched me in the face," referring to Duggins. SAC at 7; Pl. Dep. 119:23–24, 129:13–18; 135:8–9. Smith contends that instead, when Plaintiff knocked the chemical agent out of her hands, "that's when [she] tried to create space, so [she] swung and inadvertently hit him in the face, in the facial area." Smith Dep. 122:13–16. Plaintiff alleges that he suffered a broken and bloody nose, bruising to his right side and bruising on his throat. SAC at 7; Pl. Dep. 122:17–20. Plaintiff testified that after he was hit in the face, the officers cleaned up the blood on Plaintiff's face. *Id.* 136:24–137:1.

Plaintiff was subsequently "removed from the medical clinic by several officers," 56.1 Stmt. ¶ 45, though the parties dispute the circumstances under which Plaintiff's removal occurred, *see* Summ. J. Op. at 5–7. Subsequently, Plaintiff's handcuffs were removed, and

Plaintiff was photographed. 56.1 Stmt. ¶ 71; Pl. Dep. 149:20–21. Defendants contend that the photographs "do not depict any injuries on the plaintiff." 56.1 Stmt. ¶ 74. Plaintiff argues that the investigators taking the photographs "just took pictures that [were] convenient for them." Pl. Dep. 123:18–19. He nonetheless asserts that the photographs showed that his "lip [was] swollen," that one side of his nose was "lifted up," that his "neck and the front [were] red" from being grabbed and that he sustained several bruises. *Id.* 146:10–24. Plaintiff was examined approximately two hours after the Incident by a physician's assistant, who noted "Yes" on a medical form next to the question, "Did the patient have a blow to the head?" but did not note any abnormalities to Plaintiff's head, eyes, ears, nose or throat. *See* ECF No. 83-6 ("O'Grady Report") at 3–4; 56.1 Stmt. ¶ 67.

## II. Video Footage of the Incident

At some point during the altercation, a DOC "Probe Team" arrived, including Officer Tracy Storey who "operated the [h]andheld camera during the alarm." ECF No. 125-8 ("Storey Report"); *see also* ECF No. 125-9 ("Alarm Response Logbook") (noting that [hand]held camera was taken).

It is unclear from the record exactly at what point during the Incident the Probe Team arrived. One report notes that the Probe Team arrived at 11:13 a.m. and exited at 11:15 a.m. Alarm Response Logbook. Storey indicated in her report that she arrived at some point prior to Plaintiff being handcuffed. Storey Report (stating that Plaintiff "was handcuffed by Captain David Lenza #1027 and was escorted to the intake area by the Probe Team"). Officer Leisha Ortiz testified that the "Probe Team comes, Captain Lenza comes, applies the restraints, get him to his feet, and they took him to intake." Ortiz Dep. 100:2–4; *see also* ECF No. 125-23 ("Incident Review Form") at D000003 ("Castro-Martinez was forced to put his hands on the wall

and then the Probe Team arrived in the area with a camera. The officers put Castro's hands behind his back and cuffed, then put him on the floor.").

At least one report suggests that the Probe Team arrived after Plaintiff was already handcuffed. *See* ECF No. 125-10 ("Levy Report") at D000012 ("[Plaintiff] continued to resist and was flexcuffed by Captain Lenza #1027. The Probe team arrived and escorted [Plaintiff] to the Intake terminating the incident."). Captain David Levy testified that "[t]here was a Probe Team that went down with a video camera, but at that point, the use of force had already occurred." ECF No. 125-6 ("Levy Dep.") 44:22–24.

Plaintiff did not testify to when the Probe Team arrived, but his testimony gives some detail about what may have been captured on camera. He stated "you can see in the video. They threw me on the floor, and on the clinic, you see what happened in the hallway." Pl. Dep. 127:21–23; *see also id*. 126:10–127:24.

Plaintiff provided further detail about the camera, along with the Probe Team, in a February 6, 2016 interview with an investigator:

> **A:** And their they coming with the camera, there the person -- the pers-- the probe team coming with the camera. People check-- checking my -- my hands, slamming my hands in the back and -- and putting the handcuff, and then -- and putting me on the floor. They picking me up, sending me in chain.
> **Q:** So you said you -- you got your nose broken?
> **A:** Yeah, I got my nose blood cut --
> **Q:** How did they break your nose?
> **A:** My nose leaking because somebody with – with -- with force is hitting me in my nose, I don't know why he hitting me on my nose.
> **Q:** Did it happen when you hit the floor, or did somebody punch you?
> **A:** No. Somebody punched me in the nose.

ECF No. 125-2 ("Castro Interview") 5:7–18. Plaintiff continued to say:

> **A:** -- I think about this on the camera, with some copy coming, on the camera, I got hit, I got (unclear) somebody hitting me too (unclear) the captain (unclear).
> **Q:** Okay.

**A:** (Unclear). I don't know if he (unclear) -- but he take picture. I told him, "Take a picture there and there" --
**Q:** I got you.

*Id.* 6:13–19. In the interview, Plaintiff discusses the Probe Team coming in with the camera and then details his broken nose. In the second excerpt, it is unclear whether Plaintiff is referring to the alleged punch in the nose or to another moment. Plaintiff is uncertain as to whether he believes that he was punched again after he was handcuffed. *See* Pl. Dep. 129:24–130:15.

Other reports of the Probe Team do not reference any video recording. The Tour Commander's Report states that "[t]here was no video surveillance." ECF No. 125-11 ("Nance Report"). Similarly, the October 9, 2015 memorandum from Monica Windley, Warden at EMTC, states "[n]o video footage to review." ECF No. 125-12 ("Windley Mem.").

In contrast, Levy originally noted that he had viewed video footage of the Incident. In Levy's September 22, 2015 Investigating Supervisor's Report, he wrote "[b]ased on staff reports, medical documentation (staff and [Plaintiff]), and the handheld video camera, I find and conclude that staff acted appropriately" and "[w]hen viewing the handheld video camera, the visual evidence coincides with staff reports." Levy Report at D000014. Yet on June 28, 2019, Levy testified that he did not review the footage from the Probe Team camera, because pursuant to his rank as captain, he is not allowed to review the video footage of a handheld camera. Levy Dep. 44:5–45:11. He did, however, suggest through his testimony that the video existed. *Id.* 44:25–45:11.

## III.    Preservation Request

On October 6, 2015, the Legal Aid Society sent a letter to DOC on behalf of Plaintiff requesting an investigation into the Incident and asking DOC to confirm that "the Department will take steps to preserve all photographs and to properly investigate Mr. Castro-Martinez's allegations." ECF No. 125-13 ("Letter from C. Glass to M. Blake") at 2. On October 28, 2015,

Plaintiff submitted an "Inmate Grievance and Request Program Statement Form" to DOC, which contained allegations that an officer "punch[ed] [Plaintiff] in [his] face and broke[] his nose." ECF No. 125-14 ("Inmate Grievance and Request Program Statement Form").

## IV.    Destruction of the Video Footage

Defendants did not produce the video footage from the Probe Team to Plaintiff. Instead, Defendants produced a declaration from DOC, in which Officer David Kim stated that he reviewed the DOC server "where videos are archived if they are requested by a facility to be preserved after an incident," that "there is no record of any video . . . including any handheld video or any other video from EMTC, Old Clinic on September 10, 2015 at or around 11:10 am" and that if the video is not stored on the DOC server "it would have been deleted automatically." ECF No. 125-15 ("Kim Decl."). In September 2015, DOC standard procedure "was that all handheld videos were automatically deleted within ninety days, unless they were marked to be preserved by the facility if the handheld recording device captured the actual incident of a use of force." ECF No. 125-16 ("Charkowick Decl.").

## PROCEDURAL HISTORY

On October 18, 2016, Plaintiff filed his *pro se* Complaint under 42 U.S.C. § 1983, alleging that the New York City Department of Correction and one John Doe officer had violated his constitutional rights. ECF No. 2. The Court dismissed Plaintiff's claims against the Department of Correction and substituted it for the City of New York on October 28, 2016. ECF No. 6. Plaintiff filed his First Amended Complaint on December 1, 2016, asserting claims against DOC, NY Corrections and four John Doe corrections officers as defendants. ECF No. 13. The Court construed the First Amended Complaint as asserting claims against the City of New York. ECF No. 16.

Pursuant to the Court's *Valentin* order, the New York City Law Department (the "Law Department") identified the John Doe defendants on December 23, 2016. ECF No. 14. On January 24, 2017, the Court issued an order directing Plaintiff to file a second amended complaint naming the John Doe defendants and advising him that his "second amended complaint [would] completely replace, not supplement, the original and amended complaints." ECF No. 16 at 3.

Plaintiff filed his Second Amended Complaint – the operative complaint – on May 17, 2017. ECF No. 23. Plaintiff did not file page 5 of the Court's "Prisoner Second Amended Complaint Form" on May 17, 2017, ECF No. 23, but filed it separately on October 12, 2017, ECF No. 33. The Court construes this page as part of the Complaint.

On December 3, 2018, *pro bono* counsel entered a limited appearance for Plaintiff, ECF No. 45, and withdrew following the close of discovery on October 2, 2019, ECF No. 80. Defendants filed a motion for summary judgment on October 13, 2019. ECF No. 81. Plaintiff informed the Court on March 10, 2020 of his intention not to oppose the motion and asked that the motion be deemed fully briefed, but stated that he nonetheless intended to pursue the case. ECF No. 91.

On November 18, 2020, the Court ruled on the summary judgment motion, holding that Defendants City of New York, Smith, Duggins, Ortiz and Officer Trishann Mowatt were entitled to summary judgment as a matter of law with respect to all of Plaintiff's claims of excessive force with the exception of his claims against Smith and Duggins regarding the punch in the clinic. Summ J. Op. The Court also held that Defendants City of New York, Smith, Duggins, Ortiz and Mowatt were entitled to summary judgment on Plaintiff's claims for denial of medical care. *Id.*

*Pro bono* counsel entered an appearance for Plaintiff again on April 15, 2022. ECF Nos. 99, 100. Currently before the Court is Plaintiff's Motion for Sanctions for Spoliation of Electronically Stored Information. ECF No. 123.

## LEGAL STANDARD

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). For spoliation "sanctions to be appropriate, it is a necessary, but insufficient, condition that the sought-after evidence *actually existed and was destroyed.*" *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 493 (S.D.N.Y. 2022) (quoting *Farella v. City of New York*, No. 05-CV-5711 (NRB), 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007)). "A party seeking sanctions for spoliation has the burden of establishing the elements of a spoliation claim." *Leidig v. Buzzfeed, Inc.*, No. 16-CV-542 (VM) (GWG), 2017 WL 6512353, at *7 (S.D.N.Y. Dec. 19, 2017) (citing *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 109 (2d Cir. 2001)).

Federal Rule of Civil Procedure 37(e), which was amended in 2015, governs sanctions for failure to preserve electronically stored information ("ESI"). "Aside from modifying the state of mind required of a spoliator, the 2015 amendments to Rule 37(e) did not significantly alter the elements required at common law for sanctions to issue." *Ungar v. City of New York*, 329 F.R.D. 8, 13 (E.D.N.Y. 2018). The updated Rule 37(e) provides as follows:

> **(e) Failure to Preserve Electronically Stored Information.** If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> > (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

>>(A) presume that the lost information was unfavorable to the party;

>>(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

>>(C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

As such, Rule 37(e) requires a three-part inquiry: (1) whether the party failed to take "reasonable steps" to preserve ESI "that should have been preserved in the anticipation or conduct of litigation"; (2) whether the loss of ESI caused prejudice to another party such that the Court "may order measures no greater than necessary to cure the prejudice"; and (3) whether the destroying party "acted with the intent to deprive another party of the information's use in the litigation." *Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 59 (S.D.N.Y. 2020) (internal citations omitted).

The imposition of sanctions depends on whether the loss of ESI caused prejudice to another party or if the destroying party acted with the intent to deprive. If prejudice is found, sanctions must be limited to "measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Such measures may include forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. If intent to deprive is found, "a court may consider whether to impose the most severe of measures such as mandatory presumptions or instructions that the lost information was unfavorable or the entry of default judgment." *Charlestown Cap. Advisors*, 337 F.R.D. at 59 (S.D.N.Y. 2020) (internal citations omitted).

10

## DISCUSSION

Plaintiff asks that the Court find that DOC, and by extension, Defendants, have spoliated evidence by deleting the video footage. Plaintiff moves for the Court to issue an instruction that the jury may draw an adverse inference against Defendants regarding the deletion of the video, to bar Defendants from presenting evidence regarding the investigation of the Incident by DOC and to allow Plaintiff to present evidence regarding the alleged destruction of the video footage. ECF No. 124 ("Pl. Mem.") at 1, 12–13. Defendants argue that Plaintiff has not proven that the evidence in question existed or was destroyed, ECF No. 128 ("Defs. Mem.") at 2, and that DOC, rather than Defendants, was responsible for any destruction, so Defendants themselves should not be sanctioned, *id*. at 5, 8. The Court addresses first whether DOC's conduct is appropriately attributable to Defendants and second whether the elements of spoliation have been met such that a sanction is warranted.

### I.    DOC's Conduct Is Appropriately Imputed to the Defendants.

"Absent some special relationship or duty arising by reason of an agreement, contract, statute, or other special circumstance, the general rule is that there is no duty to preserve possible evidence for another party to aid that other party in some future legal action against a third party." *Stanbro v. Westchester Cnty. Health Care Corp.*, No. 19-CV-10857 (KMK) (JCM), 2021 WL 3863396, at *6 (S.D.N.Y. Aug. 27, 2021) (quoting *Wilson v. Beloit Corp.*, 921 F.2d 765, 767 (8th Cir. 1990)); *see also Johns v. Gwinn*, 503 F. Supp. 3d 452, 462–63 (W.D. Va. 2020).

Although courts have said little about what constitutes a "special relationship" sufficient to extend the duty to preserve to third-parties, courts in myriad circuits have found there to be a "special relationship" between correctional departments and individual officers, holding that the departments "ultimately bear responsibility for preserving evidence and litigating cases filed by

prisoners, and so their failure to preserve evidence may be imputed to individual officer defendants in order to avoid unfair prejudice" to litigants who are or were incarcerated. *Johns*, 503 F. Supp. 3d at 463 (collecting cases).

In finding there to be a special relationship between correctional departments and individual officer defendants, courts have looked at several factors, including (1) who employed the officer defendant; (2) who trained the officer defendant; (3) who represented the officer defendant; (4) who controls the evidence introduced in the officer defendant's favor; (5) whether the third-party indemnifies the officer defendant; and (6) whether a settlement is subject to approval by the third-party. *See id.*; *Gross v. Ludunski*, 304 F.R.D. 136, 142–43 (W.D.N.Y. 2014); *Stanbro*, 2021 WL 3863396, at *6–9.

Here, the factors weigh strongly in favor of finding a special relationship between Defendants and DOC. DOC employs Smith and Duggins, and there appears to be no dispute that DOC has trained them. ECF No. 129 ("Pl. Reply) at 6. Smith and Duggins are represented by the Law Department. The same attorneys from the Law Department represented DOC, before the Court ordered that DOC is not an entity that can be sued and substituted the City of New York as a defendant. ECF No. 25. Those same attorneys then represented the City of New York and other individual officer defendants before they were dismissed from this case. ECF Nos. 7, 20, 35. The Law Department produced evidence in this litigation, including "audio recordings and photographs of [Plaintiff], that were in DOC's physical custody." Pl. Mem. At 14; *cf. Gross*, 304 F.R.D. at 142 ("Courts hold that even where a party, as in a case such as this, lacks actual physical possession or custody of requested documents . . . such party may nevertheless be found to have *control* of the documents . . . if the party is legally entitled to the documents *or has the practical ability* to acquire the documents from a third-party."). They also produced a declaration

from a DOC officer about the possible deletion of the video. Kim Decl. And, Smith and Duggins are likely entitled to indemnification if Plaintiff were to succeed in this action. *See* N.Y. Public Officers Law § 18(4)(a); N.Y. Gen. Mun. Law § 50-k(3) (authorizing indemnification of New York City employees successfully sued for wrongful actions occurring within the scope of their employment).

Thus, DOC's and Defendants' interests are "sufficiently aligned and closely interrelated" such that imputing DOC's alleged spoliation to Defendants is appropriate. *Gross*, 304 F.R.D. at 143; *see also Guillory v. Skelly*, No. 12-CV-847 (SF), 2014 WL 4542468, at *8 (W.D.N.Y. Sept. 11, 2014) ("Defendants, being employees of DOCCS, are interrelated and share the same mission and goals with respect to the incarceration and rehabilitation of convicted persons committed to DOCCS's custody.").

Acknowledging that courts have found interests between corrections facilities and corrections officers to be sufficiently aligned and interrelated, Defendants argue that DOC's conduct should not be imputed to Defendants because Smith and Duggins "did everything in their power to ensure that any video footage was preserved by timely filing Use of Force Reports." Defs. Mem. At 7–8. Defendants note that courts have found spoliation sanctions to be unwarranted against a party "who had no duty or role with respect to the 'maintenance or destruction' of evidence at issue." *Id*. at 8 (quoting *Thousand v. Corrigan*, No. 15-CV-1025 (MAD), 2017 WL 4480185, at *3 (N.D.N.Y. Oct. 6, 2017)). While Smith and Duggins arguably "did their part in this system," Defs. Mem. At 7, there can be no dispute that had the video been preserved by DOC these Defendants would have been obligated to produce it, making imputation appropriate here. There is also nothing unfair about imposing sanctions against Smith and Duggins for DOC's failure. Because DOC's and Defendants' interests are sufficiently aligned

and closely interrelated in this action, a sanction would be "felt most acutely" by DOC. *Johns*,
503 F. Supp. 3d at 463. Any potential sanction against Defendants would therefore serve
prophylactic, punitive and remedial purposes. *West*, 167 F.3d at 779.

      That Smith and Duggins did not intentionally delete the video (nor did DOC, as the Court
finds below) and that they arguably did their part in preserving evidence is relevant to another
part of the spoliation analysis. As discussed below, Smith and Duggins doing their part to
preserve evidence weighs against any severe sanctions because there was no intent to deprive.

## II.    The Destroyed ESI Meets Rule 37(e)'s Threshold Requirements.

      Before determining whether sanctions are appropriate under either Rule 37(e)(1) or Rule
37(e)(2), the Court must first determine whether the threshold requirements have been satisfied:
(1) that relevant ESI existed; (2) that the ESI should have been preserved in anticipation of
litigation; (3) that the allegedly spoliating party did not take reasonable steps to preserve the ESI;
and (4) that the ESI cannot be entirely restored or replaced. *See Lokai Holdings LLC v. Twin
Tiger USA LLC*, No. 15-CV-9363 (ALC) (DF), 2018 WL 1512055, at *9 (S.D.N.Y. Mar. 12,
2018); *Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 580 (S.D.N.Y. 2017). "A
party seeking spoliation sanctions has the burden of establishing the elements of a spoliation
claim by a preponderance of the evidence." *Id.* (citing *Sekisui Am. Corp. v. Hart*, 945 F. Supp. 2d
494, 509–10 (S.D.N.Y. 2013)). Plaintiff meets his burden of proving each of these elements by a
preponderance of the evidence.

### a.  Video Footage Existed.

      As Defendants note, a party's spoliation motion is subject to the "obvious" requirement
that "the evidence must have existed." *Ottoson*, 268 F. Supp. 3d at 580 (quoting *Stephen v.
Hanley*, No. 03-CV-6226, 2009 WL 1437613, at *2 (E.D.N.Y. May 20, 2009)). Defendants

appear to dispute that relevant video footage ever existed. They argue that even though Storey's report indicates that she "operated the handheld camera during the alarm," that "does not prove . . . that the camera was turned on." Defs. Mem. at 2. To support this argument, Defendants state that Storey's report does not prove that the camera was turned on and point to Plaintiff's choice not to depose the camera operator. *See id*. at 2, 8.

Plaintiff has met his burden of proving by a preponderance of the evidence that the video existed. Storey's report indicates that she "responded with the Probe Team . . . and operated the [h]andheld video camera during the alarm." Storey Report; *see also* Alarm Response Logbook (noting that [hand]held camera was taken). It defies logic to understand "operate" in this context as meaning something other than creating video footage. Testimony from Plaintiff as well as Defendants' witness Levy corroborates the existence of the recording. *See* Pl. Dep. 126:10–127:24; Levy Dep. 45:6–11. Additional DOC reports acknowledge that the Probe Team had a camera. Incident Review Form at D000003; Levy Report at D000014.

Other than a report disclaiming the existence of "surveillance" footage and a report one month after the Incident claiming that there is "no video footage to review," Defendants fail to produce any testimony or evidence that Storey did not record at least some of the Incident or its aftermath. *See* Windley Mem.; Nance Report. Based on evidence pointed to by Plaintiff and no meaningful opposition from Defendants, Plaintiff has met his burden that the video footage existed.

### b.  There Was an Obligation to Preserve the Video Footage.

The moving party must demonstrate that the allegedly spoliating party "had an obligation to preserve [the evidence] at the time it was destroyed." *Klipsch Grp., Inc. v. ePRO E-Com. Ltd.*, 880 F.3d 620, 628 (2d Cir. 2018). "The obligation to preserve evidence arises when the party has

notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (quoting *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)). A party's duty to preserve is based on a two-part inquiry: (1) when did the duty to preserve attach and (2) what evidence was the party obligated to preserve? *Id.* at 216. Also, a party is only required to preserve evidence over which it has control. *Stanbro*, 2021 WL 3863396, at *11.

### i. When the Duty to Preserve Attached.

Defendants' duty to preserve evidence relevant to Plaintiff's litigation concerning the Incident arose shortly after the assault, and certainly within the 90-day period that DOC maintained video footage before automatically deleting it. In situations in which "a party has knowledge that certain types of incidents tend to trigger litigation, courts within the Second Circuit have found that a duty to preserve relevant video footage may attach as soon as the triggering incident occurs and prior to when a claim is filed." *Taylor v. City of New York*, 293 F.R.D. 601, 610 (S.D.N.Y. 2013). Given the facts of this case and DOC's experience with prior litigation related to alleged uses of force by corrections officers against incarcerated persons, it was reasonable for Defendants to anticipate shortly after September 10, 2015 that Plaintiff would initiate litigation. *See Stanbro*, 2021 WL 3863396, at *11 ("Put differently, in addition to evidence that is relevant for their purposes, the department of corrections must preserve evidence that could be relevant for a potential inmate-plaintiff's purposes.") (internal quotations omitted). An Injury to Inmate Report shows that Plaintiff reported for medical attention on September 10, 2015 at 1:00 p.m., less than two hours after the Incident and that Plaintiff stated that he had been hit on the nose. ECF No. 125-7 ("Injury to Inmate Report") at 1. Storey submitted her Use of Force Incident Report on September 11, 2015, stating that Smith used force against an

incarcerated person. Storey Report at D000027. And on September 22, 2015, Levy wrote in his

report form that Plaintiff was "struck in the facial area." Levy Report at D000012.

Even if the Incident itself did not put DOC on notice that the video footage might be

relevant to future litigation, DOC would have been on notice by early October 2015, when DOC

"should have known that the evidence may be relevant to future litigation." *Zubulake*, 220

F.R.D. at 216 (quoting *Fujitsu Ltd.*, 247 F.3d at 436). On October 6, 2015, the Legal Aid Society

sent a letter to DOC on behalf of Plaintiff requesting an investigation into the Incident and asking

DOC to confirm that "the Department will take steps to preserve all photographs." Letter from C.

Glass to M. Blake at 2. On October 28, 2015, Plaintiff submitted an "Inmate Grievance and

Request Program Statement Form" to DOC. Inmate Grievance and Request Program Statement

Form. Thus, by October 2015, DOC was on notice that materials related to the Incident might be

relevant in future litigation.

### ii.   What Evidence Defendants Were Obligated to Preserve.

"Once the duty to preserve evidence attaches, a party must save any evidence that it

'reasonably should know is relevant' to an anticipated action." *Taylor*, 293 F.R.D. at 611

(quoting *Zubulake*, 220 F.R.D. at 217). "Relevance . . . is an extremely broad concept." *Orbit

One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 436 (S.D.N.Y. 2010) (internal citations

omitted). In anticipating that Plaintiff would bring a lawsuit, Defendants should have reasonably

known that any evidence related to the Incident would be relevant to the lawsuit. This includes

evidence that might show Plaintiff's condition after his injury. *See*, *e.g.*, *Essenter v. Cumberland

Farms, Inc.*, No. 09-CV-539 (LEK) (DRH), 2011 WL 124505, at *7 (N.D.N.Y. Jan. 14, 2011)

("[T]here is no doubt that a video depicting the time before, during, and after an incident is

relevant to determine what actually happened at the moment the injury occurred.").

### iii. Defendants Had Control Over the Video Footage.

"Implicit in a party's duty to preserve evidence is the assumption that the party against whom sanctions are sought had 'control' over the missing evidence. *Stanbro*, 2021 WL 3863396, at \*11 (citing *Wandering Dago Inc. v. New York State Off. of Gen. Servs.*, No. 13-CV-1053 (MAD), 2015 WL 3453321, at \*8 (N.D.N.Y. May 29, 2015)). Defendants argue that they did not have control over the video and so the obligation to preserve evidence did not extend to them. Defs. Mem. at 5. However, the concept of control is construed broadly; if "the producing party has the legal right or the practical ability to obtain the documents, then it is deemed to have control, even if the documents are actually in the possession of a non-party." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 236 F.R.D. 177, 180 (S.D.N.Y. 2006) (quoting *Riddell Sports Inc. v. Brooks*, 158 F.R.D. 555, 558 (S.D.N.Y. 1994)).

"When assessing whether a party had the practical ability to obtain evidence from another entity, courts look at the interrelatedness of the relationship between the party against whom sanctions are sought and the entity with custody of the evidence." *Stanbro*, 2021 WL 3863396, at \*12. As discussed above, DOC's and Defendants' interests are sufficiently aligned and closely interrelated and had DOC maintained the video, Defendants would have been obligated to produce it. *See, e.g.*, *id*. (finding that an individual officer had the practical ability to obtain the evidence from DOCCS because their relationship was sufficiently interrelated and because the officer had produced other documents in the litigation that were necessarily from DOCCS); *Wilson v. Hauck*, 141 F. Supp. 3d 226, 229–30 (W.D.N.Y. 2015) (rejecting the argument that because the officer defendants are not the Department of Corrections and Community Supervision and because they did not possess the video, they did not have control over the evidence and thus had no obligation to preserve the evidence).

### c.  Defendants Did Not Take Reasonable Steps to Preserve the Video Footage.

Once the obligation to preserve relevant ESI attaches, the party in possession of that ESI must take "reasonable steps" to preserve it. Fed. R. Civ. P. 37(e). The "reasonable steps" inquiry has been equated to "roughly a negligence standard." *Leidig*, 2017 WL 6512353, at *10. Moreover, "[o]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Zubulake*, 220 F.R.D. at 218.

Although it is unknown from the record exactly what steps DOC took to preserve relevant evidence, it is clear that DOC did not preserve the video footage. In September 2015, it was DOC standard procedure to automatically delete all handheld videos within 90 days unless the videos were marked to be preserved. Charkowick Decl. On March 31, 2017, DOC stated that there was no record of any video associated with the Incident. Kim Decl. As DOC failed to suspend their routine document destruction policy, DOC failed to take reasonable steps to preserve relevant ESI.

### d.  The Video Footage Cannot Be Restored or Replaced.

Where ESI is lost following a party's failure to take reasonable steps to preserve it, "the initial focus should be on whether the lost information can be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. There was no other video footage taken around the time of the Incident, and thus, the lost ESI cannot be restored or replaced through additional discovery. Defendants do not dispute this.

## III.   Availability of Sanctions

After the threshold requirements have been satisfied, Rule 37(e)(1) "permits the imposition of sanctions only when there is 'prejudice to another party from loss of the

information.'" *Leidig*, 2017 WL 6512353, at *12 (quoting Fed. R. Civ. P. 37(e)(1)). "[S]evere

sanctions are only available under Rule 37(e)(2), and must be grounded on a finding that the

non-moving party 'acted with the intent to deprive another party of the information's use in the

litigation.'" *Lokai Holdings LLC*, 2018 WL 1512055, at *15 (quoting Fed. R. Civ. P. 37(e)(2)). If

a finding of intent is made, no separate showing of prejudice is required. *Charlestown Cap.*

*Advisors, LLC*, 337 F.R.D. at 60; Fed. R. Civ. P. 37(e) advisory committee's note to 2015

amendment ("Subdivision (e)(2) does not include a requirement that the court find prejudice . . .

the finding of intent required by the subdivision can support . . . an inference that the opposing

party was prejudiced by the loss of information."). The Court will analyze prejudice and intent in

turn.

### a. Plaintiff Was Prejudiced by the Spoliation.

Sanctions are permitted only when there is "prejudice to another party from loss of the

information." Fed. R. Civ. P. 37(e)(1). The advisory committee's note to the 2015 amendment of

Rule 37(e)(1) states that "[a]n evaluation of prejudice from the loss of information necessarily

includes an evaluation of the information's importance in the litigation." Fed. R. Civ. P. 37(e)

advisory committee's note to 2015 amendment. The Advisory Committee further cautioned that

"[t]he rule does not place a burden of proving or disproving prejudice on one party or the other,"

and that "[t]he rule leaves judges with discretion to determine how best to assess prejudice in

particular cases." *Id.*; *see, e.g.*, *In re Keurig*, 341 F.R.D. at 496 (deciding to apply the

preponderance of evidence standard with respect to prejudice). The Second Circuit has noted that

"holding the prejudiced party to too strict a standard of proof regarding the likely contents of the

destroyed evidence would subvert the prophylactic and punitive purposes of the adverse

inference, and would allow parties who have intentionally destroyed evidence to profit from that

destruction." *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998). Thus, "[i]n order to obtain curative sanctions . . . [a party] need not establish that a smoking gun . . . was irretrievably destroyed . . . It is sufficient if the existing evidence plausibly suggests that the spoliated ESI could support the moving party's case." *Karsch v. Blink Health Ltd.*, 2019 WL 2708125, at *21 (S.D.N.Y. June 20, 2019) (quoting *Coan v. Dunne*, 602 B.R. 429, 439 (D. Conn. 2019) (internal quotation marks omitted)).

Plaintiff argues that the video footage could have supported Plaintiff's case, as the footage likely contains images of Plaintiff's nose shortly after the strike, showing the effects of the punch to Plaintiff's nose. Pl. Mem. at 11. In contrast, Defendants argue that the Probe Team arrived after the alleged punch to the nose and the video would have depicted, at most, non-party Lenza flex cuffing Plaintiff and the subsequent transport to Intake. Defs. Mem. at 2. Defendants claim that the Probe Team was not present when Plaintiff was struck by Smith or Duggins. *Id*. However, even if the video did not contain footage of the alleged punch to Plaintiff's nose, the video would have contained footage surrounding the Incident, including Plaintiff's physical state.

Plaintiff's physical state after the Incident is of obvious importance to his claims. The Court previously ruled in this case that "[r]easonable jurors could . . . disagree on the extent of Plaintiff's injury," which is "the factual issue that determines the objective element of his excessive force claim[s]" against Smith and Duggins. Summ. J. Op. at 23. Officers' reports of the Incident are silent as to the appearance of Plaintiff's nose, Pl. Mem. at 11 n.2, although a medical report prepared approximately two hours afterward states that "no injuries [were] observed," Injury to Inmate Report. Levy took photographs after the Incident, though it is unclear exactly when they were taken. ECF 83-16 ("Levy Dep.") 127:7–12 ("It does not say

what time and I do not recall the time of the pictures being taken."). Defendants contend that the photographs "do not depict any injuries on the plaintiff," 56.1 Stmt. ¶ 74. Plaintiff argues that the investigators "just took pictures that [were] convenient for them," while stating that the photographs still show that one side of his nose was "lifted up." Pl. Dep. 123:18–19, 146:11. Given the time gap between the Incident and the examination on which the medical report was based, as well as the potential gap until when the photographs were taken, the Court cannot say that the video would have been merely cumulative of the medical report and photographs. Moreover, the video would likely have shown information the incident reports failed to record. Thus, the video footage may have provided evidence as to Plaintiff's state immediately following the Incident that is not available through other means.

Accordingly, the Court finds that the deleted video may have shown physical effects of the Incident helpful to Plaintiff's claims, and he has therefore been prejudiced by its destruction. Thus, Plaintiff has demonstrated entitlement to sanctions pursuant to Rule 37(e)(1), as Plaintiff has both met the threshold requirements of Rule 37(e), described above, and has been prejudiced by Defendants' spoliation of evidence. After examining whether Plaintiff has also satisfied the requirements of Rule 37(e)(2), the Court will turn to the question of what sanctions should be imposed.

### b. Defendants Did Not Act with the Intent to Deprive.

Rule 37(e) only permits the most severe sanctions, such as an adverse inference or dismissal, in instances in which the spoliating party "acted with the intent to deprive another party of the information's use in litigation." Fed. R. Civ. P. 37(e)(2). "[T]he intent contemplated by Rule 37 is not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive another party of evidence." *Leidig*, 2017 WL 6512353, at *11. A court may

22

infer that a party acted with an intent to deprive on the basis of circumstantial evidence. *See, e.g.*, *Moody v. CSX Transportation, Inc.*, 271 F. Supp. 3d 410, 432 (W.D.N.Y. 2017) (finding such intent where the defendants' failure to preserve evidence over a period of years was "so stunningly derelict as to evince intentionality").

"Although Rule 37(e)(2) does not specify the standard by which the 'intent to deprive' must be established, it is appropriate, given the severity of the sanctions permitted under that provision of the Rule, for the intent finding to be based on clear and convincing evidence." *Lokai Holdings LLC*, 2018 WL 1512055, at *8; *see also CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 499 (S.D.N.Y. 2016*)* (finding the "clear and convincing standard" to be appropriate where "the defendants seek terminating sanctions and the plaintiffs' state of mind is at issue").

Plaintiff argues that circumstantial evidence demonstrates that DOC acted with an intent to deprive. Pl. Mem. at 9. Plaintiff states first that corrections officers involved in DOC's internal investigation "either lied about the video or failed to make any effort to review it," referring to Levy's conflicting statements regarding whether he had reviewed the video and the absence of review by Nance, Miller or Windley. *Id*. Second, Plaintiff argues that DOC's "selective preservation" of evidence further demonstrates its intent to deprive, noting that Defendants preserved "every other form of ESI created in connection with the incident." *Id*. at 9–10 (citing *Ronnie Van Zant, Inc. v. Pyle*, 270 F. Supp. 3d 656, 670 (S.D.N.Y. 2017)).

The Court does not find that either act evinces an intent to deprive Plaintiff of evidence in this litigation. As to the first, neither Levy's conflicting statements nor the other officers' absence of review has a bearing on why the video was deleted. DOC maintained a policy under which evidence of this sort was automatically destroyed and no intervention stopped that

automatic destruction. Moreover, as Levy testified, he never viewed the video. Thus, there is no reason to believe that the video was deleted because Levy or another person at DOC made an affirmative decision to destroy it in light of its content.

As to the second, Plaintiff does not allege that any of the documents actually produced were subject to the same or a similar deletion policy as the video; in other words, Plaintiff does not adduce evidence that suggests DOC suspended its policy for certain documents and not for others. Nor does a lone gap in the record suggest deliberate spoliation. *See In re Keurig.*, 341 F.R.D. at 520 ("If, as Plaintiffs argue, Keurig had engaged in intentional destruction to gain an advantage in the litigation, then one would assume the record would show loss, destruction, or inaccessibility of all hard drives, rather than the isolated gaps the Court has found.") (citing *Europe v. Equinox Holdings, Inc.*, 592 F. Supp. 3d 167, 179 (S.D.N.Y. 2022) (internal quotation marks omitted)).

The scenario here, in which evidence was deleted automatically due to DOC's failure to manually retain the video, suggests only negligence. *See Ransom v. Andrews*, No. 21-CV-6343 (JPO) (BCM), 2022 WL 16555362, at *5 (S.D.N.Y. Oct. 31, 2022) (destruction of video under automatic deletion policy did not warrant Rule 37(e)(2) sanctions where "[t]here [was] no evidence that [defendant] or his counsel acted intentionally, rather than negligently, in failing to preserve the requested videotape before it was automatically destroyed"). Plaintiff has therefore not met his burden of showing by clear and convincing evidence that DOC, or Defendants, deleted the video with the intention that he be deprived of it in this litigation. Accordingly, this Court will not impose sanctions under Rule 37(e)(2).

### c.  Appropriate Remedy

A district court has broad discretion when determining the appropriate sanctions for spoliation. *West*, 167 F.3d at 779. Once a finding of prejudice is made, courts are authorized to employ measures "no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e). A sanction should be designed to: "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.'" *West*, 167 F.3d at 779 (quoting *Kronisch*, 150 F.3d at 126).

Thus, Plaintiff will be allowed to present evidence to the jury that video footage existed that would have shown, at a minimum, the aftermath of the Incident, and that the video was deleted by DOC despite the department's obligation to preserve it. This sanction will allow Plaintiff to inform the jury that this relevant evidence once existed, and thus remedy DOC's negligence in destroying the video. *See Leidig*, 2017 WL 6512353, at *13 (permitting non-spoliating party to present evidence to a factfinder regarding plaintiffs' destruction of metadata); *Charlestown Cap. Advisors, LLC*, 337 F.R.D. at 68–69 (allowing non-spoliating party to present evidence to the finder of fact regarding the loss of emails); *Ransom*, 2022 WL 16555362, at *5 (rebalancing the scales "by permitting the parties to present evidence and argument to the jury regarding loss of information") (internal quotations marks omitted). The Court denies all other requested relief.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for sanctions in GRANTED in part and DENIED in part, and sanctions pursuant to Rule 37(e)(1) of the Federal Rules of Civil Procedure

shall be imposed on Defendants, consistent with this Order. The Clerk of Court is respectfully

directed to terminate ECF No. 123.

Dated:  August 22, 2023
        New York, New York

SO ORDERED.

JESSICA G. L. CLARKE
United States District Judge